AIR TRANSPORT ASSOCIATION OF AMERICA, Airline Industrial Relations Conference, and Federal Express Corporation, Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, San Francisco Human Rights Commission, San Francisco Airport Commission, Defendants.

No. 97–1763 CW.

United States District Court, N.D. California.

April 10, 1998.

Brendan Dolan, Cecily A. Waterman, Amy E. Scheffler, Brobeck Phleger & Harrison LLP, San Francisco, CA, for Air Transport Ass'n of America, Airline Indus. Relations Conference and Federal Exp. Corp.

Stewart H. Foreman, Landels Ripley & Diamond LLP, San Francisco, CA, Dennis Aftergut, City Attorney, San Francisco, CA, Therese M. Stewart, Howard Rice Nenerovski Canady Falk & Rabin, San Francisco, CA, for City and County of San Francisco, San Francisco Human Rights Com'n and San Francisco Airports Com'n.

Kelli M. Evans, ACLU Foundation of Northern California, San Francisco, CA, Amicus Curiae ACLU Foundation of Northern California.

Matthew A. Cole, ACLU Lesbian & Gay Rights Project, San Francisco, CA, Amicus Curiae ACLU Lesbian & Gay Rights Project.

Jennifer C. Pizer, Lambda Legal Defense and Education Fund, Los Angeles, CA, Amicus Curiae Lambda Legal Defense and Education Fund, Inc.

Jeffrey Lewis, Sigman Lewis & Feinberg, Oakland, CA, Shannon Minter, National Center for Lesbian Rights, San Francisco, CA and Heidi Gewertz, San Francisco, CA, Amicus Curiae National Center for Lesbian Rights.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

WILKEN, District Judge.

### SUMMARY

For more than twenty five years, the City and County of San Francisco has required City contractors, as a condition of doing business with the City, to pledge that they will not discriminate against their employees on the basis of sexual orientation. That policy is not challenged in this lawsuit and is not addressed by this order. In 1996 and 1997, the City took steps to make the nondiscrimination requirements more concrete, enacting an ordinance barring the City from contracting with companies whose employee benefit plans discriminate between employees with spouses and employees with domestic partners. These nondiscrimination requirements apply to the contractors' activities throughout the United States. The issue before the Court is whether the City has reached beyond the limits of its power within the federal system of government 1) by applying these nondiscrimination requirements specifically to employee benefit plans, and 2) by attempting to regulate City contractors' conduct throughout the United States. On both counts, the answer largely is yes. Congress has explicitly restricted local governments' ability to regulate employee benefit plans. Moreover, the United States Constitution prevents local governments from regulating commerce that takes place entirely in other States. These two principles largely invalidate the Ordinance.

The Court disposes of the legal challenges to the Ordinance as follows. First, the City properly exercised the power given it under the California Constitution to enact the Ordinance. Second, the Board of Supervisors did have the power under the San Francisco City Charter to enact the Ordinance as it applies to the San Francisco International Airport. Third, however, the Ordinance violates the United States Constitution because it impermissibly regulates out-of-State conduct that is not related to the purpose of a contract with the City. Fourth, the Ordinance is preempted by the Employee Retirement Income Security Act (ERISA) insofar as it affects ERISA plans providing ERISA-covered benefits and insofar as the Ordinance is applied to Airport contracts. ERISA-covered benefits include health and pension plans, family medical leave and bereavement leave, but do not include memberships and membership discounts, moving expenses, or free or discounted airline travel benefits. Fifth, the Ordinance as applied to Airport contracts is not preempted by the Airline Deregulation Act (the ADA) unless the burden of complying with the otherwise-valid portions of the Ordinance is so onerous that air carriers would practically be forced to stop using the Airport. Finally, the Ordinance is not preempted by the Railway Labor Act (the RLA), the federal law regulating labor relations in the air transportation industry. The Court construes the regulations implementing the Ordinance so as to avoid the only possible conflict with this law, and thus rejects this preemption argument.

In sum, the Ordinance is unconstitutional as applied to out-of-State conduct that is unrelated to the purpose of a City contract. It is federally preempted as applied to Airport contracts insofar as it affects ERISA plans providing ERISA-covered benefits. With respect to other benefits, the Ordinance is also federally preempted if the burden of complying with the otherwise-valid portions of the Ordinance practically forces air carriers to stop using the Airport.

### PROCEDURAL BACKGROUND

Plaintiffs move for summary judgment on all of their claims that the San Francisco

Ordinance is invalid, except on their claim that it violates the dormant Commerce Clause because it imposes an undue burden on interstate commerce. (Docket # 60–1)[1] Defendants oppose Plaintiffs' motions for summary judgment and move for summary judgment on all of Plaintiffs' claims, including their claim that the Ordinance violates the dormant Commerce Clause. (Docket # 63–1) Defendants also request that the Court deny or continue Plaintiffs' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(f) because Defendants have not had an adequate opportunity to depose Plaintiffs' declarants or complete discovery. Plaintiffs oppose Defendants' motions and their application for a Rule 56(f) continuance. The Court grants Plaintiffs' motions for summary judgment in part, grants Defendants' motions for summary judgment in part, and denies summary judgment as to the remaining issue.

## FACTUAL BACKGROUND

### I. The Parties

Defendant City and County of San Francisco (the City) owns and operates San Francisco International Airport (the Airport), which is located in San Mateo, California, outside the City's borders. As of the summer of 1997, sixty nine airlines operated at the Airport, including forty regularly-scheduled passenger airlines, seventeen cargo airlines, eight seasonal or charter airlines, and four commuter airlines.

The San Francisco City Charter (the Charter) confers on Defendant Airport Commission power over the "construction, management, supervision, maintenance, extension, operation, use and control of all property [at the Airport], as well as the real, personal and financial assets which are under the Commission's jurisdiction." Charter § 4.115. The Charter confers on the City's Board of Supervisors the power to set overall objectives

for the Airport Commission to follow, and to prescribe "other powers and duties" for the Commission in addition to those specifically enumerated in the Charter. Charter § 4.102(1), (8). The Charter generally prohibits interference by members of the Board of Supervisors in the administration of City commissions, but this section specifically exempts legislation regarding administrative matters "other than specific contract and personnel decisions." Charter § 2.114.

Defendant Human Rights Commission (the HRC) of the City holds power under the Charter to "implement the provisions of ordinances prohibiting discrimination in all contracts and subsequent subcontracts, franchises, leases, concessions or other agreements for or on behalf of" the City, which includes the power to promulgate implementing regulations. Charter § 4.107(6), (7).

Plaintiff Air Transport Association (the ATA) is the principal trade organization for airlines based in the United States. One of its purposes is to advocate the industry's positions before State and local governments and in the courts. As of the summer of 1997 sixteen members of ATA flew into the Airport, including United Airlines (United) and Federal Express.

Plaintiff Airline Industrial Relations Conference (AIRCON) is another airline trade organization formed to exchange labor relations information and advocate for the industry in government, judicial and agency proceedings relating to labor relations. As of the summer of 1997, fifteen members of AIRCON flew into the Airport, including United and Federal Express.

### II. The Ordinance and the Implementing Regulations

Since 1972, the San Francisco Administrative Code has barred the City from contracting with companies that discriminate on the

---

**1.** Plaintiffs originally moved for a preliminary injunction as well (Docket #60–2), but withdrew this motion based on Defendants' representation that City officials would include a status quo provision in imminent leases and permits. On February 25, 1998, Plaintiffs filed a new motion for a temporary restraining order and preliminary injunction with respect to the application of

the ordinance to a lease sought by Federal Express Corporation. On February 26, 1998, Federal Express joined this action as a Plaintiff and joined the other Plaintiffs' motions for a temporary restraining order and preliminary injunction, but did not join the motions that the Court addresses in this Order.

basis of sexual orientation. *See* S.F.Admin.Code Chap. 12B. In series of legislative actions beginning in the fall of 1996 and extending through the spring of 1997, the City's Board of Supervisors passed ordinances amending Chapter 12B. These amendments (collectively referred to hereinafter as the Ordinance) restrict the City from contracting [2] with companies that do not provide benefits to their employees' domestic partners to the same extent they provide benefits to employees' spouses.

Specifically, the Ordinance bars any company that discriminates in the provision of benefits "between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of such employees, where the domestic partnership has been registered with a governmental entity pursuant to state or local law authorizing such registration." S.F.Admin.Code § 12B.1(b). The Ordinance also requires that every City contract incorporate language whereby the prime contractor agrees that it will not discriminate in the provision of employee benefit during the term of the contract. *Id.* at § 12B.2(b). The Ordinance applies to any employee benefits, but it includes a non-exclusive illustrative list: "bereavement leave, family medical leave, health benefits, membership and membership discounts, moving expenses, pension and retirement benefits or travel benefits." *Id.* at §§ 12B.1(b), 12B.2(b).

The Ordinance provides that a potential contractor will not be deemed to discriminate in the provision of benefits in two situations. First, if a contractor's actual cost of providing a certain benefit for the domestic partner of an employee exceeds that of providing the benefit to a spouse and the contractor provides the benefit on the condition that the employee pay the excess cost, the contractor is not deemed to discriminate. *Id.* The same rule applies if the cost of providing benefits for spouses exceeds that of providing benefits for domestic partners. *Id.* Second, if a contractor is unable to provide a certain benefit that it provides to employees' spouses

also to employees' domestic partners or *vice versa*, despite taking reasonable measures to do so, but the contractor provides the affected employees with a cash equivalent of the benefit, the contractor is not deemed to discriminate. *Id.*

The Ordinance's nondiscrimination requirements apply to:

(i) any of a contractor's operations within San Francisco;

(ii) a contractor's operations on real property outside of San Francisco owned by the City or which the City has a right to occupy if the contractor's presence at that location is connected to a contract or property contract with the City;

(iii) where the work is being performed by a contractor for the City within the United States; and

(iv) any of a contractor's operations elsewhere in the United States.

*Id.* at § 12B.1(d). (Hereinafter, subsection (i) will be referred to as San Francisco conduct, subsections (ii) and (iii) as contract-related conduct, and subsection (iv) as extraterritorial conduct.) The Ordinance includes a severability clause that provides that the Ordinance should be "construed so as not to conflict with applicable federal or state laws, rules or regulations" and so as not to confer powers or duties on the City that exceed the limitations on municipal authority imposed by federal law. *Id.* at § 12B.6. The clause provides that if a court holds any part of the Ordinance invalid, the remainder of the Ordinance should remain in effect. *Id.*

The Ordinance states that the City's intent in requiring the contractual nondiscrimination guarantees is to "equalize to the maximum extent legally permitted" the total compensation provided to similarly-situated employees with spouses and employees with domestic partners. *Id.* at § 12B.2(b). Defendants state that the City's goal in passing the Ordinance is to add a concrete requirement to its condition that contractors not discriminate on the basis of sexual orientation.

---

**2.** The Ordinance refers to contracts and property contracts, but not to subcontracts or subleases. Except where the distinction is relevant, the

Court refers to contracts and property contracts collectively as contracts.

The contractual nondiscrimination guarantees are enforced as follows: A contractor is deemed to have breached the nondiscrimination provision upon a finding by the Director of the HRC that the contractor willfully violated the provision. *Id.* at § 12B.2(g)(1). This finding may be appealed to the full HRC and may be further challenged in court. *Id.* at § 12B.2(g)(3)–(7). If a contractor is found to have discriminated, the City may impose a $50 penalty for each day of discrimination against each person affected, and may suspend or terminate the contract, in whole or in part, retaining all moneys due or to become due under the contract. *Id.* at § 12B.2(h). A breach of the nondiscrimination guarantee also is grounds for deeming the contractor an "irresponsible bidder," which bars the contractor from getting City contracts for up to two years or until it comes into compliance. *Id.* at § 12B.2(i).

Defendant HRC has promulgated regulations implementing the Ordinance. *See id.* at § 12B.2(g)(9) (authorizing HRC to promulgate implementing regulations); HRC Rules of Procedure for the Nondiscrimination in Contracts: Equal Benefits Provisions of Chapter 12B of the San Francisco Administrative Code, dated May 8, 1997 (hereinafter, HRC Rules of Procedure). These rules, as relevant here, provide that no contractor will be deemed out of compliance with the Ordinance until the contractor's current collective bargaining agreement has expired, provided that the agreement governs the benefits, that the contractor takes all reasonable steps in the meantime to end discrimination, including asking the union to reopen the contract, and that the contractor provides cash equivalents. *Id.* at § II.D(1). The rules explicitly permit contractors to avoid discrimination by providing benefits to neither employees' spouses nor employees' domestic partners. *Id.* at § II.D(3)(c).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorable to the non-moving party, the movant is clearly entitled to pre-

vail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1288–89 (9th Cir.1987).

### II. Standing

 The Court only has jurisdiction to decide issues that Plaintiffs have standing to raise in federal court. Plaintiffs argue that they have standing to raise these claims on behalf of their members. An association has standing to bring such claims when:

(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The first and second requirements are easily satisfied here. Therefore, Plaintiffs' standing turns on whether the participation of individual members is necessary to resolve any issues in this case. For most of Plaintiffs' claims, the participation of individual members is not required and the Court can rule on the claims in this Order. Regarding one aspect of ADA preemption, the participation of individual carriers might be required. Because the parties have not briefed this particular issue, however, the Court does not decide it in this Order. *See* CONCLUSION, *infra.* Therefore, Plaintiff associations have standing to litigate all of the issues decided in the present Order.

### III. State Constitutional and City Charter Restrictions on the City's Authority to Enact the Ordinance

Plaintiffs contest whether the City has the authority under the California Constitution or the San Francisco City Charter to legislate with respect to Airport contracts.

### A. State Constitution

■ Plaintiffs argue that the City lacked the power under the California Constitution to enact the Ordinance because the Ordinance is impermissibly extraterritorial and because it is preempted by conflicting State laws.

Municipalities ordinarily derive their power to regulate from their police power over their physical territory. The California Constitution provides that a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinance and regulations not in conflict with general laws." Cal. Const. art. XI, § 7. The Ninth Circuit has specifically recognized, however, that the City has proprietary power over the San Francisco International Airport, even though the Airport lies outside its boundaries, and that this power includes the ability to enter into commercial relationships. *Air Cal. Inc. v. City and County of San Francisco*, 865 F.2d 1112, 1117 (9th Cir.1989). Because the Ordinance reaches beyond the boundaries of San Francisco only by placing conditions on who may enter into Airport-related contracts with the City, it falls within the City's proprietary powers. Although Plaintiffs clearly anticipate that the Ordinance will have extraterritorial effects, for example, by inducing an airline to offer domestic partner benefits nationwide, these possible effects do not establish that the City has acted beyond its powers under the California Constitution.

■ Plaintiffs also argue that the Ordinance is preempted by conflicting State law because it does not address strictly "municipal affairs." Local regulations are generally subject to preemption by State law. The California Constitution creates an exception, however, for charter city provisions addressing "municipal affairs." Cal. Const. art. XI § 5 (City charter provisions "with respect to municipal affairs shall supersede all laws inconsistent therewith," but "in respect to other matters they shall be subject to general laws."). The California Supreme Court has "reject[ed] a static and compartmentalized description of 'municipal affairs' in favor of a more dialectical one ... [in which] the counterpoint of 'statewide concern' [is] the conceptual limitation on the scope of 'municipal

affairs.'" *California Federal Savings & Loan v. Los Angeles*, 54 Cal.3d 1, 13, 283 Cal.Rptr. 569, 812 P.2d 916 (1991).

> If [a reviewing court] is persuaded that the subject of the state statute is one of statewide concern and ... the statute is reasonably related to its resolution, then the conflicting city charter measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited ... from addressing the statewide dimension by its own tailored enactments.

*Id.* at 17, 283 Cal.Rptr. 569, 812 P.2d 916. The court's duty is to "'allocate the governmental powers in the most sensible and appropriate fashion as between local and state legislative bodies,'" *id.* (citation omitted), considering the particular factual circumstances in the case before it, *id.* at 18, 283 Cal.Rptr. 569, 812 P.2d 916, and being careful not to destroy municipal home rule. *Id.* Where possible, courts should avoid making this difficult choice "by carefully ensuring that the purported conflict [between the local and state regulations] is in fact a genuine one, unresolvable short of choosing between one enactment and the other." *Id.* at 17, 283 Cal.Rptr. 569, 812 P.2d 916.

Plaintiffs claim that the Ordinance conflicts with a Statewide policy of managing airports in a manner that secures the benefits of commerce and tourism for the people of California. Cal.Pub.Util.Code § 21690.5(e) ("Legislative findings and declarations"). There is no "genuine" and "unresolvable" conflict between this sweeping policy statement and the Ordinance. Plaintiffs offer no evidence that the State interprets this policy in a way that would preclude the Ordinance, nor any evidence that the State has implemented this policy through "tailored enactments" that conflict with the Ordinance.

■ Plaintiffs also argue that if the Ordinance survives ADA preemption as it applies to free airline passes for domestic partners, it will conflict with a State law that also purports to regulate the provision of free passes by the airlines and which they argue would also survive ADA preemption. *See* Cal.Pub.Util.Code § 522. Although the Court concludes below that the travel bene-

fits provision of the Ordinance is not preempted by the ADA as related to price, the State statute nevertheless may be preempted on this basis because it directly regulates who may use the carriers' services at no price. *See* Section V.C.3.b, *infra.* Even if it were not preempted, however, the statute does not irresolvably conflict with the Ordinance. The statute permits provision of free passes to employees' family members. Without evidence that the State considers it a matter of Statewide concern that family members be uniformly interpreted to exclude domestic partners, the Court cannot conclude that a genuine conflict exists.

Defendants, therefore, are entitled to prevail on summary adjudication of Plaintiffs' claim that the Ordinance is invalid under the California Constitution.

## B. City Charter

■ Plaintiffs also argue that the Ordinance is invalid insofar as it applies to Airport-related contracts, because under the San Francisco City Charter the Board of Supervisors may not interfere with contracting decisions by the Airport Commission. Defendants respond that the Ordinance is valid under charter provisions adopted in 1995 that give the Board of Supervisors the power to overall objectives for commissions through legislation.

The powers and duties of San Francisco commissions are defined in Article IV of the City Charter. The Airport Commission is specifically given "charge of the construction, management, supervision, maintenance, extension, operation, use and control all property ... [and] assets which are under the Commission's jurisdiction." Charter § 4.115. All commissions are required to devise plans, programs and policies "consistent with the overall objectives of the City and County, as established by the Mayor and by the Board of Supervisors through the adoption of City legislation." Charter § 4.102(1). Section 2.114 of the Charter generally prohibits interference by members of the Board of Supervisors in the administration of City commissions, but this section specifically exempts legislation regarding administrative matters "other than specific contract and personnel decisions."

The Ordinance modifies twenty-five-year-old City-wide policy of contracting only with companies that do not discriminate on the basis of sexual orientation in their personnel policies. This legislation sets an "overall objective" for the City, and the City Charter requires the Airport Commission to pursue a consistent policy as it exercises its powers to manage the operations of the Airport. The Ordinance does not refer to a specific contract, and so is not barred by section 2.114 of the charter.

Plaintiffs rely on *Air Cal, Inc. v. City and County of San Francisco,* 865 F.2d 1112 (9th Cir.1989), to argue that the Board of Supervisors lacks the power to dictate conditions of Airport-related contracts. In *Air Cal,* the Ninth Circuit concluded that under the then-current City Charter, San Francisco had delegated all of its proprietary powers over the Airport to the Airport Commission. *Id.* at 1118. The Ninth Circuit relied on section 2.401, which then, as now, prohibited interference by members of the Board of Supervisors with administrative matters of the commissions. *Id.* at 1119. As of 1995, however, section 2.401 specifically empowers the Board to pass legislation on administrative matters other than specific contract or personnel decisions. *Id.* Therefore, the Ninth Circuit's conclusion in 1989 that the Board of Supervisors lacked the power to pass ordinances affecting contract administration at the Airport does not govern this case.

Defendants, therefore, are entitled to prevail on summary adjudication of Plaintiffs' claim that the Ordinance is invalid as an improper exercise of legislative power under the San Francisco City Charter.

## IV. Constitutional Challenges

Plaintiffs claim that the Ordinance is invalid under the United States Constitution as an attempt by the City to regulate conduct performed beyond its borders. Plaintiffs cite cases that rely on three separate bases for striking down State action as impermissibly extraterritorial: the Due Process Clause of the Fourteenth Amendment, principles of State sovereignty and comity, and the dor-

mant Commerce Clause. Defendants dispute that the Ordinance is impermissibly extraterritorial and also argue that it does not violate the dormant Commerce Clause by imposing undue burdens on interstate commerce.

The Court concludes that the Ordinance violates the dormant Commerce Clause to the extent that it impermissibly regulates extraterritorial commerce; therefore, the Court need not consider Plaintiffs' due process extraterritoriality arguments. The Court concludes, however, that the Ordinance does not otherwise violate the dormant Commerce Clause by imposing undue burdens on interstate commerce.

### A. Applicability of the Dormant Commerce Clause

■ The Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, empowers Congress to "regulate Commerce with foreign Nations, and among the several States." The Supreme Court has interpreted the clause not only to grant legislative power to Congress, but also impliedly to limit the power of State and local governments to enact laws affecting foreign and interstate commerce. *See Healy v. Beer Institute,* 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). The implied limitation on State and local powers is referred to as the dormant Commerce Clause.

Defendants argue that the dormant Commerce Clause is not relevant to this case because it restricts State action only in the absence of Congressional authorization of such action. "When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. Courts are final arbiters under the Commerce Clause only when Congress has not acted." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 154–55, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (citation omitted). Defendants cite five cases in which courts rejected dormant Commerce Clause arguments because Congress had acted in the relevant field of regulation, but in each of these cases Congress

had specifically authorized the challenged State action. *See id.* 455 U.S. at 155 (challenged tax had been approved by federal officials); *see also, Northeast Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.,* 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) (challenged State laws authorized in federal statute); *W. & S. Life Ins. Co. v. State Bd. of Equalization of California,* 451 U.S. 648, 653, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (same); *Panhandle E. Pipe Line Co. v. Public Serv. Comm'n,* 332 U.S. 507, 520–21, 68 S.Ct. 190, 92 L.Ed. 128 (1947) (same). Defendants argue that by enacting the proprietary powers exception to ADA preemption, Congress has authorized laws such as the Ordinance and thus the Court does not have the power to review the Ordinance under the dormant Commerce Clause. *Cf. Sea Air Shuttle Corp. v. Virgin Islands Port Authority,* 800 F.Supp. 293 (D.Vi.1992) (port authority's actions were authorized under the proprietary powers exception to ADA preemption and therefore did not violate the dormant Commerce Clause). The Court, however, concludes below that the Ordinance does not fall within the proprietary powers exception to the ADA. *See* Section V.C.4, *infra.*

The Court concludes, therefore, that the Ordinance is subject to the strictures of the dormant Commerce Clause.

### B. Extraterritoriality

■ The dormant Commerce Clause precludes State and local laws that have the extraterritorial effect of regulating "commerce occurring wholly outside the boundaries of a State." *Healy,* 491 U.S. at 336. "When a state statute directly regulates ... interstate commerce, ... we have generally struck down the statute without further inquiry." *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). This strict bar is based both on the dormant Commerce Clause and on principles of State sovereignty: "The principles guiding this assessment ... reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate com-

merce and with the autonomy of the individual States within their respective spheres." *Id.* 491 U.S. at 335; *see also BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 1597, 134 L.Ed.2d 809 (1996) ("one State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, ... but is also constrained by the need to respect the interests of other States").

In *Brown–Forman,* the Court struck down a State statute that required distillers to post prices for in-State sales of their products during a certain month and to guarantee that they would not sell the product at a higher price elsewhere in the United States during that month. *Brown–Forman,* 476 U.S. at 575–76. The Court held that this law "regulates out-of-state transactions in violation of the Commerce Clause. Once a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month.... While New York may regulate the sale of liquor within its borders, ... it may not 'project its legislation into [other States] by regulating the price to be paid' for liquor in those States." *Id.* at 582–83 (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)). *See also, Gore,* 116 S.Ct. at 1597 (a State cannot penalize "conduct that was lawful where it occurred and that had no impact on [the State] or its residents").

■ The Ordinance has a similar effect. Once a company signs a City contract, it cannot provide discriminatory benefit packages to its employees anywhere in the United States without facing penalties imposed by the City. In other words, the City effectively regulates certain extraterritorial practices of City contractors. Unless shielded by the market participant exception to the dormant Commerce Clause, discussed below, the Ordinance is unconstitutional as applied to out-of-State conduct. *See* S.F. Admin.Code § 12B.1(d)(iv). Although contract-related conduct, *see* 12B.1(d)(ii), (iii), might also occur beyond the State's borders, it would not be "commerce occurring wholly outside the [City's] borders" because the City would have entered into the contract. San Francisco conduct, that is, conduct described in § 12B.1(d)(i), takes place only on territory covered by the City's police powers and thus that section raises no extraterritoriality concerns. The Ordinance, therefore, potentially violates this aspect of the dormant Commerce Clause only with respect to the out-of-State conduct covered by section 12B.1(d)(iv).

## C. Marketplace Participation Exception

Defendants argue that, despite the Ordinance's extraterritorial reach, it does not conflict with the dormant Commerce Clause because the City is acting as a market participant when it imposes conditions on its contractors. The Supreme Court first recognized a market participant exception to the dormant Commerce Clause in *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.* 426 U.S. at 810. In *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), the Supreme Court upheld a Boston mayoral executive order that required all construction projects funded in whole or in part by city funds to be performed by a work force at least half of which consisted of city residents. *Id.* 460 U.S. at 206. "Insofar as the city expended only its own funds in entering into construction contracts for public projects, it was a market participant" and the order was valid under the Commerce Clause. *Id.* at 214–15. The Court rejected as irrelevant arguments that the order would have a significant impact on out-of-State workers and that the order swept too broadly, creating more of a burden than was necessary to accomplish its objectives. *Id.* at 209–10. "If the city is a market participant, then the Commerce Clause establishes no barrier." *Id.* at 210. In a footnote, however, the Court stated,

there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts busi-

ness. [citation omitted] We find it unnecessary in this case to define those limits with precision, except to say that we think the Commerce Clause does not require the city to stop at the boundary of formal privity of contract. In this case, the Mayor's executive order covers a discrete, identifiable class of economic activity in which the city is a major participant. Everyone affected by the order is, in a substantial if informal sense, "working for the city."

*Id.* at 211 n. 7.

In *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), a plurality of the Court held that Alaska had exceeded the limits of the market participant exception, but Justice Rehnquist, author of the *White* opinion, vehemently dissented. In *Wunnicke,* Alaska had conditioned the sale of State-owned timber on a commitment that the primary manufacture of the timber take place in Alaska. *Id.* 467 U.S. at 84. The plurality held that this law violated the dormant Commerce Clause and could not be saved by the market participant exception: "The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market." *Id.* at 97. The plurality rejected an interpretation of the doctrine that would "validate under the Commerce Clause any contractual condition that the State had the economic power to impose." *Id.* at 97 n. 10. In his dissent, Justice Rehnquist stated that the plurality's distinction between market participation and market regulation invoked antitrust principles inapplicable to a Commerce Clause analysis, and noted that Alaska could achieve the same result by modifying its law so that it clearly fell within the doctrine. *Id.* at 101–103 (Rehnquist, J., dissenting).

There is no question that the City is acting as a market participant when it implements the Ordinance: when the City enters into contracts that are subject to the Ordinance, it is directly participating in the marketplace by purchasing services or leasing property. The only question before the Court, therefore, is whether, by implementing the Ordinance, the City inappropriately reaches beyond the sphere of economic activity in which it is participating in an attempt to regulate commerce beyond its borders.

The Court concludes that the Ordinance reaches too far to be shielded by the market participant exception. Contractors must guarantee that, throughout the term of the contract, they will not provide discriminatory employee benefit packages in "any of [their] operations elsewhere within the United States." S.F. Admin.Code § 12B.1(d)(iv). Technically, subsection (iv) does not "reach beyond the immediate parties with which the government transacts business," *White,* 460 U.S. at 211 n. 7, because only companies that sign contracts with the City are affected. However, this class of economic activity encompasses much more than that in which the City is a "major participant," *id.,* and the individuals affected by the Ordinance could hardly be described, even informally, as "working for the city." *Id.* Under the plurality's test in *Wunnicke,* section 12B.1(d)(iv) of the Ordinance surely fails as applied to out-of-State conduct. This section applies to contractor conduct that is not related to the purpose of the contract. *Cf.* § 12B.1(d)(iii) (contract-related conduct carried out anywhere in the United States). By operation of this subsection, a contractor may face penalties, termination of the contract, a two-year bar from contracting with the City, and forfeiture of moneys owed by the City under the contract. These consequences are certainly substantial enough to create a regulatory effect on the contractors' out-of-State activities. The Ordinance, therefore, has "a substantial regulatory effect outside of [the] particular market" in which the City participates. Chief Justice Rehnquist's criticisms of the plurality's approach in *Wunnicke* do not apply here. There is no way that the City could modify this portion of the Ordinance so that it would meet the requirements of the marketplace participant doctrine. The Court concludes, therefore, that the imposition of national nondiscrimination guarantees pursuant to the Ordinance is not shielded by the market participant exception.

The Ordinance, therefore, impermissibly regulates out-of-State commerce. Therefore, the Court strikes down the Ordinance insofar as it applies to the out-of-State conduct described in S.F. Administrative Code section 12B.2(d)(iv).

### D. Burdens on Interstate Commerce

 Defendants argue that the Ordinance does not otherwise violate the dormant Commerce Clause by imposing excessive burdens on interstate commerce. In determining whether a State or local government has overstepped its role in regulating interstate commerce, the Supreme Court has distinguished "between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions." *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). A statute that discriminates against interstate commerce on its face or in practical effect is invalid unless the State can demonstrate "both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). On the other hand, if a statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

 The Ordinance burdens interstate commerce because out-of-State companies that provide discriminatory benefits packages are barred from obtaining certain City contracts. The Ordinance does not, however, discriminate by its terms or in practical effect between intrastate and interstate commerce: companies that do business only within California are subject to the same constraints.

Because the Ordinance on its face does not discriminate between in-State and out-of-State commerce, it must be analyzed under the *Pike* formulation of the dormant Commerce Clause test. The Ordinance regulates even-handedly and the Court finds that the City has acted to effectuate a legitimate local public interest, the City's long-term interest in not indirectly supporting discriminatory business practices. A plurality of the Supreme Court has recognized that local governments have a compelling interest "in assuring that public dollars ... do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 492, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion) (discussing race discrimination and noting that government involvement in private discrimination may be unconstitutional). Similarly, Maryland's highest court has recognized that a city may have a legitimate and strong public interest in dissociating itself from discriminatory practices. In *Board of Trustees of Employees' Retirement System of City of Baltimore v. Mayor and City Council of Baltimore City (City of Baltimore),* 317 Md.72, 562 A.2d 720 (1989), the Maryland court upheld against a dormant Commerce Clause challenge Baltimore ordinances that required divestiture of city funds from companies doing business in South Africa. The court explained that "it is indisputable that the Ordinances effectuate legitimate, local public interests.... They permit the City and its citizens to distance themselves from the moral taint of coventuring in firms that, in the view of many, help to maintain South Africa's system of racial discrimination. Finally, they express the City's sensitivity to the deep feeling of its citizens on this matter of fundamental human dignity." *Id.* at 143, 562 A.2d 720. San Francisco has a long history of taking a principled stand against discrimination and of being in the forefront of efforts to ban discrimination based on sexual orientation. *See, e.g., Alioto's Fish Co. Ltd. v. Human Rights Comm'n of San Francisco,* 120 Cal.App.3d 594, 600 & n. 4, 174 Cal.Rptr. 763 (since 1972, City has prohibited contractor from discriminating on the basis of sexual orientation). Thus, the Ordinance effectuates a legitimate local public interest, to combat discrimination on the basis of sexual orientation.

The Ordinance fails, therefore, only if the burdens it places on interstate commerce are

clearly excessive in relation to the putative local benefits. As applied to conduct in San Francisco, *see* § 12B.1(d)(i), employees working within the City who had been victims of discrimination directly benefit. The applications of the Ordinance that cover contract-related conduct, *see* § 12B.1(d)(ii), (iii), serve to keep the City from directly participating in discriminatory business practices. These sections also are shielded by the market participant exception. Even as applied to the in-State conduct covered by § 12B.1(d)(iv), the local interest in dissociating the City from discrimination justifies the minor burden of requiring companies to modify discriminatory benefit plans, especially because contractors can comply with the Ordinance without increasing their benefit costs. The Ordinance permits companies to reduce or eliminate benefits as a means of compliance.

The Court concludes, therefore, that the Ordinance, insofar as it does not violate the dormant Commerce Clause's bar against extraterritorial regulation, also does not violate the dormant Commerce Clause as an excessive burden on interstate commerce.

### E. Summary of Constitutional Challenges

Plaintiffs are entitled to prevail on summary adjudication of their claim that the Ordinance is impermissibly extraterritorial to the extent the Ordinance is applied to out-of-State conduct that is not related to the purposes of the City contract. *See* S.F. Administrative Code § 12B.1(d)(iv). With respect to all other applications of the Ordinance, Defendants are entitled to prevail on summary adjudication of Plaintiffs' claim that the Ordinance violates the dormant Commerce Clause of the United States Constitution.

## V. Preemption by Federal Law

### A. General Principles

▇▇▇ Federal preemption of State law may be express, typically as provided in a preemption clause of a federal statute, or implied, either because the State law is an obstacle to accomplishing the full purposes and objectives of Congress with respect to a federal law (conflict preemption) or because the existence of a comprehensive federal regulatory scheme implies that Congress intended to occupy the entire field of regulation (field preemption). *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The inclusion of an express preemption provision in a federal statute implies that Congress did not intend to preempt other matters. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). In every case, the scope of preemption turns on Congressional intent. *N.Y. State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Courts must begin with the "starting presumption that Congress does not intend to supplant state law. Indeed, . . . where federal law is said to bar state action in fields of traditional state regulation, we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* 514 U.S. at 654–55 (citations omitted). Plaintiffs argue that the Ordinance is preempted under the express preemption provision of ERISA, and under both express and implied preemption principles of the ADA and the RLA.

### B. Preemption by ERISA

#### 1. Standing

▇▇▇ Defendants argue that Plaintiffs do not have standing to raise their ERISA preemption argument because they are not among the enumerated categories of persons who may bring a declaratory relief action directly under the act. *See* 29 U.S.C. § 1132(a) (limiting statutory right to seek declaratory judgment to enumerated parties). Plaintiffs, however, have not brought an action based on § 1132(a), but instead raise a claim of federal preemption based on the Supremacy Clause of the Constitution. The Ninth Circuit recognized the distinction between these causes of action in *Hydrostorage, Inc. v. Northern Calif. Boilermakers Local Joint Apprenticeship Comm.*, 891 F.2d 719, 724–25 (9th Cir.1989) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14,

103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)); *see also*, Section V.C.1, *infra* (discussion of cause of action to raise ADA preemption challenge). Defendants concede that individual carriers have standing to raise this claim. Plaintiffs' associational standing derives from its members' standing. *See* Section II, *supra*. Therefore, except as noted previously in the Court's discussion of associational standing, *id.*, Plaintiffs have standing to challenge the Ordinance based on ERISA preemption.

### 2. Legal Standards

ERISA contains an express preemption clause providing that the law "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" as described in the act. 29 U.S.C. § 1144(a).

In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court defined "relates to" as "has a connection with or reference to," *id.* 463 U.S. at 97, and stated that the phrase should be given a broad interpretation. *Id.* at 98. In *Shaw*, the Court had "no difficulty" in concluding that a State nondiscrimination law related to employee benefit plans. *Id.* at 96. The law, which forbade discrimination on the basis of sex, had been interpreted by a State court to require employers who provided disability benefit to provide benefits for pregnancy leave as well. *Id.* at 88. The Court found that the law was preempted to the extent that it banned practices that were lawful under federal law. *Id.* at 108.

In subsequent decisions, the Court continued to interpret the "relates to" phrase in the ERISA preemption provision expansively. For example, in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the Court held that ERISA preempted a State law wrongful discharge claim that was based on an allegation that an employer fired an employee in order to avoid making pension contributions. *Id.* 498 U.S. at 140. The Court held that the cause of action related to ERISA plans because it "makes specific reference to, and indeed is premised on, the existence of a pension plan." *Id.* In *Mackey v. Lanier*

*Collection Agency & Service*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the Court held that a State garnishment law that specifically exempted ERISA plans was preempted because it expressly referred to ERISA plans, *id.* 486 U.S. at 829, but that a generally-applicable garnishment law was not preempted because it did not conflict with Congressional objectives in enacting ERISA, *id.* at 831. In *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992), the Court considered a law that required employers who provided health coverage for their active employees also to provide equivalent coverage for injured employees who were eligible for workers' compensation benefits. *Id.* 506 U.S. at 126–27. The Court held that law was related to ERISA plans, and therefore was preempted, because it imposed obligations to provide health coverage that were "measured by reference to" employee health plans, which are ERISA-covered plans. *Id.* at 130.

More recently, the Supreme Court has retreated from such an expansive interpretation of the ERISA preemption provision, although it has reaffirmed the specific holdings of these earlier cases. In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Court cautioned against extending the meaning of "relate to" to "the furthest stretch of its indeterminacy." *Id.* 514 U.S. at 655. The Court observed that there must be some limit to ERISA preemption, but acknowledged that neither the language of the provision nor the Court's prior decisions interpreting that language provided much guidance as to where to draw the line. *Id.* The Court concluded, "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656.

The Court concluded in *Travelers* that the purpose of the ERISA preemption clause "was to avoid a multiplicity of regulations in order to permit the nationally uniform ad-

ministration of employee benefit plans." *Id.* Reviewing prior cases in which it had found ERISA preemption, the Court explained that those laws had "mandated employee benefit structures or their administration" or provided an alternate enforcement mechanism for ERISA plans. *Id.* 514 U.S. at 658. Comparing these laws to the law at issue in *Travelers,* the Court concluded that "[b]oth the purpose and the effects" of the *Travelers* law distinguished it and saved it from preemption. *Id.* at 658.

In *Travelers,* the Court reviewed a State law that imposed surcharges on certain health maintenance organizations (HMOs) and required hospitals to collect surcharges from patients covered by a commercial insurer, but exempted patients insured by a Blue Cross/Blue Shield plan (Blues). *Id.* at 649. Commercial insurers had challenged the law to the extent it was applied to patients whose insurance or HMO coverage had been purchased by an ERISA-covered employee health plan. *Id.* The district court had concluded that the law was preempted because the surcharges increased costs for HMOs and insurers other than the Blues, and hence increased their premiums, which significantly affected purchasing decisions by ERISA plans. *Id.* at 652.

Considering both the purpose and the effect of this law, the Court concluded that Congress did not intend ERISA to preempt it. The justification for the law, which the Court found credible, was that the Blues paid their bills more promptly and efficiently, and covered patients who would have been rejected by commercial insurers as unacceptable risks. *Id.* at 658. By imposing surcharges on the Blues' competitors, which presumably were passed on to these insurers' or HMOs' customers in the form of higher premiums or membership fees, the law had the effect of making the Blues a more attractive option for purchasers of health insurance, including ERISA plans, than they otherwise would have been. *Id.* at 659. The Court concluded, however, that this was only an "indirect economic influence [that did] not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." *Id.* at 659. This indirect influ-

ence did not interfere with Congress' objectives in enacting ERISA: it did not "preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one. It simply bears on the costs of benefits." *Id.* at 660. The Court found "nothing remarkable about surcharges on hospital bills" and noted that even absent State action they had been common since before ERISA was enacted and had varied substantially across regions, which made it unlikely that Congress intended State laws with similar effects to be preempted. *Id.* at 660.

Despite holding that the indirect economic effect of the surcharge law did not merit preemption, the Court cautioned that some indirect influences might. "[T]here might be a point at which an exorbitant tax leaving consumers with a Hobson's choice would be treated as imposing a substantive mandate." *Id.* at 664. At the conclusion of the opinion, the Court noted:

> [W]e do not hold today that ERISA preempts only direct regulation of ERISA plans, nor could we do that with fidelity to the views expressed in our prior opinions on the matter. We acknowledge that a state law might produce such acute, albeit indirect economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted.

*Id.* at 668 (citations omitted).

The Court reaffirmed the *Travelers* approach to ERISA preemption in *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 117 S.Ct. 832, 838, 136 L.Ed.2d 791 (1997), and again explored the issue of when indirect effects on ERISA plans might be preempted. In *Dillingham,* the Court considered whether ERISA preempted a statute that required public works contractors to pay prevailing wages to their employees, but permitted them to pay lower wages to apprentices if the apprentices belonged to a State-approved apprenticeship program. *Id.* 117 S.Ct. at 835. Arguing that the apprenticeship program was an ERISA plan, a contractor claimed

that the law related to ERISA plans. *Id.* at 836.

The Court discussed separately the "reference to" and "connection with" prongs of the "relates to" test. Reviewing *Greater Washington, Mackey,* and *Ingersoll–Rand,* the Court explained that a law refers to an ERISA plan if it "acts immediately and exclusively upon ERISA plans ... or [if] the existence of ERISA plans is essential to the law's operation." *Id.* at 838. Because the Court concluded that apprenticeship programs did not necessarily have to be ERISA plans, it concluded that the law did not refer to ERISA plans and was not preempted on this basis. *Id.* at 838–39.

With respect to the "connection with" test, the Court stated that it would apply the *Travelers* "purpose and effects" test to determine whether the law conflicted with ERISA's objectives. *Id.* at 838. The Court did not expressly review the statute's purposes, however. Discussing the law's effects, the Court explained that it had found a connection with ERISA plans in previous cases, including *Shaw,* because the laws at issue in those cases had " 'mandated employee benefit structures or their administration.' " *Id.* at 839 (quoting *Travelers,* 514 U.S. at 658). The prevailing wage statute, on the other hand, like the law at issue in *Travelers,* had only an indirect economic influence on those plans. *Id.* at 840. The law "does not bind ERISA plans to anything," the Court observed. *Id.* at 841. Contractors could use no apprentices, could use apprentices from a State-approved program, or could use apprentices from an unapproved program. The law merely imposed different apprentice wage rates based on whether or not the apprenticeship program had been approved by the State. *Id.* The Court noted that such "differential economic incentives" on apprenticeship programs predated ERISA and would exist based on similar federal prevailing wage statutes even absent the State law under consideration. *Id.* Because the law "alters the incentives, but does not dictate the choices" of ERISA plans and because the economic inducement was not "tantamount to a compulsion," the law was insufficiently connected with ERISA plans to be preempted.

*Id.* at 842. Addressing the fundamental issue of Congressional intent, the Court noted that apprenticeship standards and public works employment standards were areas traditionally regulated by the States and "remote from the areas with which ERISA is expressly concerned—'reporting, disclosure, fiduciary responsibility, and the like.' " *Id.* at 840 (quoting *Travelers,* 514 U.S. at 661 (quoting *Shaw,* 463 U.S. at 98)).

In a concurrence to *Dillingham,* Justice Antonin Scalia, who was joined by Justice Ruth Bader Ginsburg, wrote, "I think it accurately describes our current ERISA jurisprudence to say that we apply ordinary field pre-emption, and, of course, ordinary conflict pre-emption. . . . except as establishing that, 'relates to' is irrelevant." *Id.* 117 S.Ct. at 843 (Scalia, J., concurring). In *Boggs v. Boggs,* —— U.S. ——, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997), another ERISA preemption case decided later the same term, the Court relied solely on conflict preemption principles to resolve the case and found it unnecessary to "inquire whether the statutory phrase 'relate to' provides further and additional support for the preemption claim." *Id.* 117 S.Ct. at 1761. The Court also suggested that if conflict preemption had not resolved the case, it would have considered whether the law was preempted under field preemption principles. *Id.*

### 3. Does the Ordinance "Relate to" ERISA plans?

Defendants argue that the Ordinance does not "relate to" ERISA plans for four reasons: first, the Ordinance refers only to benefits, not plans; second, the Ordinance does not mandate changes in ERISA plans because employers can provide separate plans to provide benefits for domestic partners and those separate plans would not be ERISA plans; third, the Ordinance does not operate exclusively on ERISA plans; and fourth, the Ordinance does not have a substantial connection with ERISA plans because it creates only indirect economic incentives for employers to modify their plans.

#### a. Relates to Benefits

██ Defendants argue that the Ordinance is not affected by the ERISA preemp-

tion provision because it refers only to ERISA benefits and not to ERISA plans.

In *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 7–8, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Supreme Court noted that ERISA preempts State laws only if they "relate to any employee benefit *plan*" and not simply because they relate to employee benefits. Attempting to identify what constitutes a "plan," the Court noted that "the terms 'employee benefit plan' and 'plan' are defined only tautologically in the statute," and concluded that the meaning of "plan" had to be derived from Congress' purposes in enacting ERISA. *Id.* 482 U.S. at 8–9. Congress enacted ERISA, the Court concluded, in part to ease the administrative burdens of providing benefits to employees: "An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records." *Id.* at 9. The Court noted that these obligations arise only "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligations." *Id.* at 12.

The Court held that the State law in question, therefore, did not relate to benefit plans. *Id.* The law required employers to provide a severance payment to employees in the event of a plant closing. *Id.* at 3–4, 12. Because the "requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation," the law did not relate to employee benefit plans: "To do little more than write a check hardly constitutes the operation of a benefit plan." *Id.* at 12. Thus, the Court's conclusion that the law did not relate to employee benefit plans turned on the nature of the benefit the law required employers to provide to their employees.

To the extent the Ordinance is applied to benefits that, like the severance payments at issue in *Fort Halifax,* require no "ongoing administrative program," the Ordinance does not apply to a "plan" and thus is not preempted. Of the benefits listed in the Ordinance's non-exclusive list of affected benefits, only moving expenses appear to fall into this category. *See* S.F. Admin.Code §§ 12B.1(b), 12B.2(b). Moving expenses, however, are not even ERISA-covered benefits. Thus, ERISA does not preempt the Ordinance insofar as it affects this benefit in any case. *See* Section V.B.3.c.i, *infra.* Most of the other listed benefits require procedures for "determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records." *Id.* at 9. That is, they can only be administered through some sort of plan. When the Ordinance refers to the "provision" of benefits such as these to employees or their relatives, the Ordinance is referring to employee benefit plans. The HRC regulations implementing the Ordinance confirm that the Ordinance refers to ERISA plans: these regulations explain that the Ordinance prohibits City contractors from "discriminating in the provision of benefits" and define "benefits" as "any plan, program or policy provided by a City Contractor to its employees as part of the employer's total compensation package." HRC Rules of Proc. I, II.A.

The Court, therefore, rejects Defendants' argument that the Ordinance is not preempted by ERISA because it relates only to employee benefits rather than employee benefit plans.

b. Separate Plans for Domestic Partners

Defendants also argue that the Ordinance does not "mandate employee benefit structures" because employers can purchase separate insurance coverage for their employees' domestic partners ("stand-alone plans"), which would not be ERISA plans.[3]

---

**3.** Amici curiae also argue that the Ordinance does not require changes in employee benefit structures because employers can provide their employees' domestic partners with cash equivalents or the benefits provided to employees'

spouses. The Ordinance, however, permits payment of cash equivalents only "in the event a contractor is unable to provide a certain benefit, despite taking reasonable measures to do so." S.F.Admin.Code § 12B.1(b). The court express-

This argument fails for two reasons. First, stand-alone plans would be employee welfare benefit plans under ERISA. Second, even if they were not ERISA plans, the Ordinance nevertheless imposes an obligation that is measured by reference to ERISA plans, which leads to preemption under the authority of *Greater Washington.*

### i) Stand–Alone Plans are ERISA Plans

Defendants argue that if employers purchase separate health insurance policies for their employees' domestic partners, those policies would not be part of an ERISA plan.

Five ERISA definitions are relevant to this argument: employee benefit plan, employee welfare benefit plan, participant, beneficiary, and plan. ERISA defines an employee benefit plan as either an employee welfare benefit plan or an employee pension benefit plan. 29 U.S.C. § 1002(3). An employee welfare benefit plan is defined as "any plan, fund, or program . . . established or maintained . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical [and other] benefits." *Id.* at § 1002(1). ERISA defines "participant" as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . or whose beneficiaries may be eligible to receive any such benefit." *Id.* at § 1002(7). ERISA defines "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *Id.* at § 1002(8). The statute does not define "plan, fund or program," but in *Fort Halifax*, the Court roughly defined a plan as an ongoing administrative program.

Defendants' posited program of buying separate health insurance policies for domestic partners fits the definition, reasonably construed, of an employee welfare benefit plan. The program would certainly be a "plan" under the authority of *Fort Halifax:*

providing the benefits would require an ongoing administrative program. Employers would have to determine the domestic partners' eligibility, locate and purchase policies providing benefits equivalent to those provided to employees' spouses, and make periodic premium payments. Employers establishing and maintaining stand-alone plans would be doing so for the purpose of providing medical benefits. Domestic partners fall within ERISA's definition of a "beneficiary." This definition contains two requirements: the individual must be "designated by a participant, or by the terms of an employee benefit plan" as a beneficiary, and the individual must be "entitled to a benefit thereunder." Domestic partners certainly would be entitled to benefits under a stand-alone plan, and presumably they would be designated as beneficiaries by the terms of the plan. Ordinarily, employee benefit plans identify which dependents are eligible for coverage. Presumably, a stand-alone plan would operate in the same manner.

The definition of an employee welfare benefit plan, however, requires the plan to provide benefits to "participants or their beneficiaries." Therefore, for the stand-alone plans to be employee welfare benefit plans, the domestic partners not only must be beneficiaries, but they must be *participants'* beneficiaries. Based on ERISA's definition of "participant," Defendants argue that the domestic partners could not be "participants' beneficiaries." The statute defines "participant" as one who is "eligible to receive a benefit of any type from an employee benefit plan which covers employees" or one *"whose beneficiaries* may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). Defendants argue that under the stand-alone plan, employees' domestic partners would not be eligible to receive "any such benefit," that is, a benefit from an employee benefit plan "which covers employees." The stand-alone plan would not provide benefits to any employees, but only to employees' domestic partners. No employees would be participants in the plan, Defendants argue, and the

es no opinion about whether the Ordinance would be preempted by ERISA if it provided all contractors with the option of providing cash

equivalents in lieu of modifying their ERISA plans.

domestic partners would not be "participants' beneficiaries."

Essentially, Defendants derive from the definition of "participant" a requirement that all employee welfare benefit plans must directly provide benefits to employees. There are several reasons why this argument is unconvincing. First, Defendants' reading of the "participant" definition is based on two unsupported assumptions. Defendants assume that "any such benefit" restricts the benefits to those provided by a plan "which covers employees." Instead, "any such benefit" refers to "a benefit of any type." Defendants also assume that a plan "covers" employees only if it directly provides benefits to employees. ERISA's regulations, however, use the phrase "covered under the plan" to encompass more than receipt of benefits from the plan. The regulations provide that a person is not a "participant covered under an employee welfare plan" if that person does not receive benefits *and* is not designated as a participant, which implies that the person would be covered under the plan if he or she received benefits *or* was designated as a participant. *See* 29 C.F.R. § 2510.3–3(d).[4] An employee could participate in the plan by virtue of having a beneficiary who receives benefits under the plan.

Second, a Department of Labor opinion letter confirms that a benefit plan can be an ERISA plan even if no employees receive benefits under the plan. The administrator of a fund to provide scholarships to the children of employees asked the Department of Labor who would qualify as participants and beneficiaries under the plan. The Department stated an opinion that the children were beneficiaries of the plan and the employees were participants under the plan, even though no employees received benefits under the plan. Dept. of Labor Pension & Welfare Benefit Programs Opinion 81–54 A (June 22, 1981). Defendants argue that the Department of Labor relied on the fund director's representation that the fund was an ERISA plan, and thus that the letter does not reflect the department's legal opinion that the fund is an ERISA plan. The letter, however, states that the director "recognize[d]" the fund as an ERISA plan; the fact that the fund was an ERISA plan was not included in the letter's list of "facts and representations" on which the department relied in issuing its opinion. Even if the department accepted the director's representation that the fund was an ERISA plan, the letter nevertheless demonstrates that employees may "participate" in an ERISA plan without receiving any benefits under that plan.

Third, Defendants' interpretation of the ERISA definitions is an unnatural reading of the act. If Congress intended to restrict the definition of ERISA plans to those that provide benefits directly to employees, it would have included this restriction in the definition of an employee welfare benefit plan rather than bury it within the definition of "participant." Moreover, if employee benefit plans were restricted to those covering employees and did not include plans that provide benefits solely to beneficiaries, "employee welfare benefit plan" would not be defined as one providing benefits for "participants *or* their beneficiaries."[5] Because the employees who receive benefits under the plans would be "participants," the use of "or" would be superfluous and misleading.

**4.** As further support for their argument that only a plan that provides benefits to employees is an ERISA plan, Defendants cite an ERISA regulation that provides that "the term 'employee benefit plan' shall not include any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan, as defined in paragraph (d) of this section." 29 C.F.R. § 2510.3–3(b). As the Court just explained, however, § 2510.3–3(d) illustrates that employees need not receive benefits from a plan to be "participants covered under the plan." Employees whose domestic partners receive benefits under

the stand-alone plans would qualify as participants of the plan. Furthermore, § 2510.3–3(b) seems to address a different issue: the rule notes that plans providing benefits only to non-employee partners or sole proprietors are not employee welfare benefit plans. Therefore, it seems to address benefit plans that solely serve the owners of a business and not their employees or their employees' beneficiaries.

**5.** Defendants misquote this provision as "participants *and* their beneficiaries." Dft. Reply at 16 (emphasis added).

**1172**

Finally, Defendants' interpretation is not consistent with the purposes of the statute. It is of course commonplace for employee benefit programs to provide benefits not only to employees but also to their dependents or other beneficiaries. ERISA was designed to protect all such participants and beneficiaries from mismanagement of benefit programs and to ensure uniform national administration of such plans. If segments of an employer's benefit program could be set apart and exempted from ERISA coverage, despite the fact that they pose the same risks to beneficiaries and impose the same administrative burdens on the employer as the core benefit plans, ERISA's dual objectives would be undermined.

The Court concludes, therefore, that the stand-alone plans proposed by Defendants would be ERISA plans.

**ii) Stand–Alone Plans are Measured by Reference to ERISA Plans**

Even if stand-alone plans for employees' domestic partners were not ERISA plans, it would not follow that the Ordinance does not relate to ERISA plans. Like the law at issue in *Greater Washington,* the Ordinance imposes an obligation to provide benefits that is measured by reference to employee benefit plans.[6] The *Greater Washington* law required employers who provided health benefits to their active employees also to provide those benefits to their disabled employees who had qualified for Workers' Compensation benefits. *Greater Washington,* 506 U.S. at 126–27. The District Court had upheld the law in part because employers could comply by creating a separate administrative unit to administer the required benefits, which would have been exempted from ERISA as a Workers' Compensation plan. *Id.* at 128. The Supreme Court, however,

held that the law was preempted because it imposed requirements to provide benefits that were "measured by reference to" employers' existing employee health plans, which were ERISA plans. *Greater Washington,* 506 U.S. at 130. The Ordinance here also imposes requirements to provide benefits that are measured by reference to employers' existing employee health coverage: contractors must provide benefits to their employees' domestic partners only to the extent that they already provide benefits to their employees' spouses. The effect of the Ordinance on ERISA plans is indistinguishable from the effect of the law at issue in *Greater Washington.*[7]

Defendants argue that the Ninth Circuit interpreted *Greater Washington* narrowly in *WSB Electric, Inc. v. Curry,* 88 F.3d 788 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 945, 136 L.Ed.2d 834, and that the Ordinance does not relate to ERISA plans under that interpretation. In *WSB Electric,* the Ninth Circuit considered whether a State prevailing wage statute was preempted by ERISA. In calculating the prevailing wage in a county, the State included the employer's cost of fringe benefits provided to most workers in the area. *Id.* at 790. To determine whether a public works contractor was paying the prevailing wage, the State also took into account the contractor's contributions to benefit plans for those workers. *Id.* at 791. After discussing *Greater Washington* and other Supreme Court ERISA cases, the court concluded that a State law refers to ERISA plans "if it mentions or alludes to ERISA plans, *and* has some effect on the referenced plans." *Id.* at 793. The prevailing wage statute did not refer to ERISA plans, the court found, because its "references to ERISA plans ... have no effect on

---

6. The Supreme Court's recent ERISA decisions have categorized *Greater Washington* as a "reference to" case. This Court concludes below that the Ordinance here does not refer exclusively to ERISA plans and therefore must be analyzed under the "connection with" test. *Greater Washington* nevertheless is relevant. Pursuant to the "connection with" test, the Court must assess the Ordinance's effects on ERISA plans. As the Court discussed further in the following paragraph, the "measured by reference to" test turns on a State law's effects on ERISA plans.'

7. The Ordinance differs, of course, in that it applies only to employers who have contracts with the City rather than applying to all employers subject to the City's police powers. This distinction becomes relevant if the City may invoke a market participant exception to ERISA preemption, an issue discussed in Section V.B.4, *infra.*

any ERISA plans but simply take them into account when calculating the cash wage that must be paid.... The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefit at all." *Id.* In *WSB*, the obligation imposed by the prevailing wage law was not measured by reference to the contractors' ERISA plans: the contractor had to pay a fixed amount in combined wages and benefits, regardless of whether the employer offered any benefits at all to its employees. The existence of benefit plans merely affected how this total obligation was allocated between wages and benefits.[8] The Ordinance, on the other hand, requires contractors with discriminatory benefit plans to provide the particular benefit offered to employees' spouses also to employees domestic partners or to alter their plans in some other fashion to eliminate the discrimination. The Ordinance imposes an obligation to provide benefits equal to those that are provided through a contractor's ERISA plans, like the law at issue in *Greater Washington.* In *Greater Washington,* the Supreme Court noted the Court of Appeals' finding that "[b]y tying the benefit levels of the workers' compensation plan to those provided in an ERISA-covered plan, *'[the law] could have a serious impact* on the administration and content of the ERISA-covered plan.'" *Id.* 506 U.S. at 129 (quoting *Greater Washington Board of Trade v. District of Columbia,* 948 F.2d 1317, 1325 (D.C.Cir.1991) (emphasis added)). The Court's holding in *Greater Washington* turned on the law's effect on ERISA plans, therefore, and not on a mere mention of ERISA plans in the statute.

The Court, therefore, rejects Defendants' argument that the Ordinance does not refer to ERISA plans because contractors can comply with the Ordinance by establishing stand-alone benefit plans for employees' domestic partners.

#### c. "Reference To"

▮▮▮ Defendants argue that because the Ordinance, like the law at issue in *Dillingham,* does not apply exclusively to ERISA

plans, it does not refer to ERISA plans and must be analyzed instead under the "connection with" branch of ERISA preemption analysis. Defendants are correct that the Ordinance affects both ERISA and non-ERISA benefit plans. The Court also agrees that, under current Supreme Court authority, the Ordinance does not refer to ERISA plans because it does not act exclusively on ERISA plans.

#### i) Some Benefits Listed in the Ordinance are Not ERISA Benefits and Some May Be Provided Through Non–ERISA Plans

The Ordinance does not exclusively affect ERISA plans. Some, but not all, of the benefits affected by the Ordinance are not even covered by ERISA and others may be provided through non-ERISA plans.

As noted earlier, ERISA preempts State laws that "relate to any employee benefit *plan."* ERISA defines "employee benefit plan" as either an "employee pension benefit plan" or an "employee welfare benefit plan." 29 U.S.C. § 1002(3). Each plan is defined in part in terms of the benefits it provides. Employee pension benefit plans are plans that provide retirement or deferred income. *Id.* at § 1002(2). Employee welfare benefit plans are plans that provide "(A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title." 29 U.S.C. § 1002(1). Title 29 section 186(c) describes essentially the same benefits.

▮▮▮ Some of the benefits included in the non-exclusive list of benefits affected by the Ordinance are not covered by ERISA. *See* S.F. Admin.Code § 12B.1(b). Specifically, membership or membership discounts, moving expenses and travel benefits are not among those benefits listed in the statute's definitions of employee benefit plans. *See also,* 29 C.F.R. § 2510.3(e) (employee welfare

---

8. The law placed certain caps on the amounts that could be credited to benefits, *id.* at 791, but the court found these caps to have only an "incidental impact" on ERISA plans. *Id.* at 795.

benefit plan does not include employee discounts). Defendants claim that family medical leave and bereavement leave also are non-ERISA benefits, but these benefits seem to fall within the category of benefits provided "in the event of sickness, accident, disability [or] death." To the extent the Ordinance requires provision of non-ERISA benefits, it is not preempted by ERISA. This holds true even if these non-ERISA benefits are administered through a plan that also provides ERISA benefits. *See* 29 U.S.C. § 1002(1) (plan, fund or program is employee welfare benefit plan *"to the extent that* such plan, fund or program was established or is maintained for the purpose of providing" enumerated benefits) (emphasis added); *Kemp v. Int'l Business Machines Corp.*, 109 F.3d 708, 713 (11th Cir.1997) (non-ERISA benefits do not fall within ERISA's reach merely because they are included in a multi-benefit plan along with ERISA benefits).

Some of the benefits listed in ERISA's definitions of employee benefit plans do not necessarily have to be provided through ERISA plans. In *Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), the Supreme Court ruled that a practice of paying vacation benefits, which are among ERISA's listed benefits, out of an accumulated fund would constitute an ERISA plan, but that paying the same benefits out of an employer's general assets would not. *Id.* 490 U.S. at 115; *see also*, 29 C.F.R. § 2510.3–1(b)(3)(i) (practice of paying vacation benefits out of general assets is not an employee welfare benefit plan). In *Dillingham*, the Court relied on *Morash* to conclude that apprenticeship programs were not necessarily ERISA plans, because an employer theoretically could pay for such a program out of its general assets. *Dillingham*, 117 S.Ct. at 838. The Court reached this conclusion even though most and possibly all of the affected programs were ERISA plans. *Id.* at 839 n. 5.[9]

Defendants contend that all ERISA benefits can be offered through non-ERISA plans. But *Morash* is not applicable to all benefit programs. In *Morash*, the Court relied on the fact that vacation benefits are not "analogous to other welfare benefits, in which either the employee's right to a benefit is contingent upon some future occurrence or the employee bears a risk different from his ordinary employment risk." *Morash*, 490 U.S. at 116. "The distinguishing feature of most of these benefits is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside the control of the employee." *Id.* at 115–16. "Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address." *Id.* at 115. Vacation benefits paid out of general assets, therefore, did not implicate ERISA's concerns with preventing mismanagement of funds and assuring that employee benefits will be available when needed. Many of the benefits covered by the Ordinance, however, such as health insurance and pension and retirement benefits, are contingent on future occurrences and ordinarily are paid out of funds that accumulate over time. Thus, even if financed out of an employer's general assets, these plans would present the sort of risks ERISA was designed to control and would still be governed by ERISA. *Cf. Alaska Airlines, Inc. v. Oregon Bureau of Labor*, 884 F.Supp. 393, 398 (D.Or.1995) (in assessing whether unfunded plan to provide sick leave benefits, which were paid out of employer's general assets, was an ERISA plan, court considered whether plan implicated Congressional concerns underlying ERISA), *aff'd*, 122 F.3d 812 (9th Cir.1997). *Morash*, therefore, does not stand for the principle that any ERISA-covered benefit could be provided through a non-ERISA plan if financed from the employer's general assets.

ERISA regulations confirm that some of the benefits listed in the Ordinance can be offered through non-ERISA plans. The pay-

---

9. Plaintiffs note that ERISA's definition of employee welfare benefit plans is not restricted to funded plans, but encompasses plans providing the specified benefits "through the purchase of insurance or otherwise." 29 U.S.C. § 1002(1).

In *Morash*, however, the Supreme Court specifically interpreted § 1002(1) to exclude practices of paying vacation benefits out of an employer's general assets. Plaintiffs fail to address the Supreme Court's opinion in *Morash*.

roll practice of compensating an employee from the employer's general assets during periods when the employee is able to work but does not work is not an ERISA plan. *Id.* at § 2510.3–1(b)(3). Thus, bereavement leave and family medical leave, two benefits listed in the Ordinance, could be offered through non-ERISA plans if they were paid from the employer's general assets.

Thus, some of the benefits that are listed in the Ordinance, such as moving expenses, memberships and membership discounts and travel benefits, are not governed by ERISA at all. A plan to provide other benefits, such as bereavement and family medical leave, may be an ERISA plan or a non-ERISA plans. A plan to provide the remaining benefits, however, such as health and pension benefits, is necessarily an ERISA plan.

### ii) Acts Exclusively on ERISA Plans

Defendants argue that because some of the benefits affected by the Ordinance need not be offered through ERISA plans, the Ordinance does not "act [ ] immediately and exclusively upon ERISA plans ... [nor is] the existence of ERISA plans [ ] essential to the law's operation." *Dillingham,* 117 S.Ct. at 838. Therefore, Defendants argue, the Ordinance does not "refer to" ERISA plans as that term is defined in *Dillingham, id.,* and the Ordinance is preempted only if it has a "connection with" ERISA plans.

Defendants are correct in observing that the Ordinance does not act exclusively on ERISA plans and that ERISA plans are not essential to the Ordinance's operations. As the Court noted above, the Ordinance affects benefit plans that are not regulated by ERISA. Moreover, an employer who provides only non–ERISA benefits or who provides ERISA benefits only through non–ERISA plans is nevertheless affected by the Ordinance. For example, a small business-woman who provides no health or pension benefits, but who provides discounts for employees' family members and compensates her employees for family medical leave out of the business's general assets, would have to provide these benefits on a nondiscriminatory basis if she contracts with the City. Thus, the existence of an ERISA plan is not essential to the Ordinance's operation. Before

concluding that the Ordinance does not "refer to" ERISA plans, the Court must determine whether such a result is consistent with the Supreme Court's recent ERISA preemption decisions.

Prior to *Travelers* and *Dillingham,* the distinction between the "reference to" and the "connection with" test was not as significant as it is under these recent cases. In *Shaw,* for example, the Supreme Court held that a nondiscrimination law related to ERISA plans, without distinguishing between whether it referred to the plans or had a connection with the plans. *Shaw,* 463 U.S. at 96–97. Under *Travelers* and *Dillingham,* however, the distinction can be significant. If a law refers to ERISA plans, it is automatically preempted, but if the law does not refer to ERISA plans, courts must consider, under the "connection with" test, whether the purpose and effect of the law interfere with Congress's objectives in enacting ERISA. It is in the context of the "connection with" test that the Court has retreated from its previously expansive interpretation of ERISA preemption. Under the "connection with" heading, the Court returned to fundamental preemption principles, principles that Justices Scalia and Ginsburg stated should govern all ERISA preemption analysis and an approach that the Court at least tentatively adopted in *Boggs.*

A narrow construction of the "reference to" test is consistent with the Court's effort to return to fundamental preemption principles. If the "reference to" test is strictly confined to laws that exclusively refer to ERISA plans, most ERISA preemption cases will be reviewed under a test that is more consistent with fundamental preemption principles. Also, those laws that are struck down because they refer exclusively to ERISA plans are more likely to have been specifically designed to regulate ERISA plans, in which case preemption would be appropriate. This Court applies the *Dillingham* "reference to" test literally, therefore, and concludes that the Ordinance does not refer to ERISA plans.

### d. "Connection With"

Under the "connection with" test, the Court must consider whether the pur-

pose and effect of the Ordinance interfere with Congress' objectives in enacting ERISA. Congress' dual purposes were to protect participants and beneficiaries from mismanagement of benefit funds and to ease the administrative burden on employers of managing such funds by eliminating the need to comply with inconsistent State and local regulation of employee benefit plans. Laws that "mandate [ ] employee benefit structures or their administration" are preempted under the "connection with" test.

The purpose of the Ordinance is to combat discrimination on the basis of sexual orientation by requiring City contractors to modify employee benefit plans that discriminate between employees with spouses and employees with domestic partners. This goal, however laudable, directly interferes with ERISA's goal of shielding employee benefit plans from inconsistent State and local regulation.

The effect of the Ordinance is to require City contractors with discriminatory benefit plans to modify those plans. Although they have certain choices about how to modify the plans, they cannot comply with the Ordinance's nondiscrimination requirements without somehow altering their ERISA plans. The Ordinance, like the nondiscrimination law that the Supreme Court found preempted in *Shaw*, "mandates employee benefit structures" because it requires City contractors to provide the benefits on a nondiscriminatory basis.

Defendants argue, however, that the Ordinance creates only indirect effects on contractors' benefit plans because the contractors have the option of rejecting the City contract and leaving their benefit plans intact. By conditioning City contracts on a nondiscrimination-in-benefits requirement, Defendants argue, the Ordinance merely creates economic incentives for companies to modify discriminatory benefit plans. Under the *Travelers/Dillingham* "connection with" test, they argue, only where those incentives are "tantamount to a compulsion" is the Ordinance preempted by ERISA. Defendants' argument, essentially, is that the Ordinance is not preempted because it applies only where the City is acting as a market partici-

pant. Because the Ordinance applies only to companies that choose to do business with the City, Defendants argue, the City can accomplish through the Ordinance what it cannot accomplish through generally-applicable legislation: it can dictate certain employers' choices regarding their employee benefit plans.

The "connection with" test, however, does not establish a market participant exception to ERISA preemption. It addresses an entirely different question: when a law that does not directly regulate ERISA plans but rather regulates other subjects, such as hospital bill surcharges or the wages paid on public works projects, nevertheless relates to ERISA plans. Where the Supreme Court has addressed market participant exceptions to federal preemption, it has applied different criteria than those incorporated into the "connection with" test. *See* Section V.B.4.b, *infra.* Therefore, the market participation question is separate from whether the Ordinance relates to ERISA plans. First, the Court must determine whether the Ordinance's nondiscrimination requirements have a connection with City contractors' ERISA plans. Because they mandate changes in discriminatory benefit plans, the Court has already concluded that they do. Next, the Court must determine whether the Ordinance nevertheless escapes ERISA preemption because it only imposes these conditions on companies with which the City does business. The Court addresses the latter question in the following section of this Order.

The Court concludes that the Ordinance has a connection with ERISA plans because it mandates employee benefit structures for City contractors and because the purpose and effect of the Ordinance conflict with ERISA's objective of permitting uniform national administration of employee benefit plans and eliminating the need to comply with conflicting State and local regulations.

4. Is the Ordinance Exempt from ERISA Preemption Because the City Was Not Acting as a Regulator?

Defendants argue that the Ordinance is not preempted by ERISA because the City is acting as a marketplace participant, not as a regulator, in imposing these conditions on

City contracts. Defendants first argue that the Ordinance is not a "State law" within the meaning of the ERISA preemption provision, because it only affects City contractors. Additionally, they invoke a marketplace participant exception that the Supreme Court has recognized in other contexts.

### a. State Law

■ ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). State laws are further defined as "laws, decisions, rules, regulations, or other State action having the effect of law." *Id.* at § 1144(c)(1).

Defendants cite two district court decisions in which the courts found that bid specifications for public works contracts were not "State laws" for purposes of ERISA preemption. *See Lott Constructors, Inc. v. Camden County Board of Chosen Freeholders*, 1994 WL 263851 (D.N.J.1994); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. County of St. Louis*, 825 F.Supp. 238 (D.Minn.1993). In *Minnesota*, the lead case, the court held that the bid specification was not a "State law" but rather was a "proprietary action" of the county. *Minnesota*, 825 F.Supp. at 243. As support for its holding, the court cited the Supreme Court's ruling in *Building & Const. Trades Council v. Associated Builders* (hereinafter, *Boston Harbor*), 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), discussed further below, that National Labor Relations Act (NLRA) preemption does not apply when a State or local government " 'pursues its purely proprietary interests.' " *Id.* (quoting *Boston Harbor*, 507 U.S. at 231); *see also, Lott*, 1994 WL at *18–19 (relying on *Minnesota* and *Boston Harbor* for its holding). This Court agrees that *Boston Harbor*'s explanation of when a local government acts as a regulator and when it acts as a proprietor is directly relevant to the question of whether the Ordinance has the effect of law and thus is subject to ERISA preemption. However, because the Court concludes in the following section of this Order that the City is acting as a regulator when it implements the Ordinance, the Court rejects Defendants' argument that the Ordi-

nance is not a "State law" for purposes of ERISA preemption.

### b. Marketplace Participant Exception

The market participant exception that the Supreme Court has recognized with respect to the dormant Commerce Clause does not automatically apply in other contexts. "The 'market participant' doctrine reflects the particular concerns underlying the Commerce Clause, not any general notion regarding the necessary extent of state power in areas where Congress has acted." *Wisconsin Dept. of Indus., Labor and Human Relations v. Gould*, 475 U.S. 282, 289, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), *quoted in Hydrostorage, Inc. v. Northern California Boilermakers Local Joint Apprenticeship Comm.*, 891 F.2d 719, 730 (9th Cir.1989).

Although the Supreme Court has not ruled on whether a market participant exception exists to ERISA preemption, the Ninth Circuit has twice held that no such exception exists. These decisions predate *Travelers* and *Dillingham*, however, and the Court concludes that under current law the Ninth Circuit cases must be interpreted to recognize a narrow market participant exception to ERISA preemption.

In *Hydrostorage*, the Ninth Circuit analogized from *Gould*, a Supreme Court NLRA case, and held that no market participant exception applies to ERISA preemption. In *Gould*, the Court noted that Congress enacted the NLRA in order to centralize the administration of labor policy in a federal agency. *Gould*, 475 U.S. at 289–90. The Court stated, "we cannot believe that Congress intended to allow States to interfere with [federal administration of labor policy] as long as they did so through exercises of the spending power." *Id.* at 290. *Hydrostorage* quotes *Gould* and implies that the same considerations apply to ERISA preemption. *Hydrostorage*, 891 F.2d at 730.

After the Ninth Circuit decided *Hydrostorage*, the Supreme Court recognized a narrow market participant exception to NLRA preemption in *Boston Harbor*. In a subsequent case, the Ninth Circuit reconsidered whether there was a market participant exception to ERISA preemption in light of the Supreme Court's decision in *Boston Harbor*.

See *Dillingham Construction N.A., Inc. v. County of Sonoma*, 57 F.3d 712 (9th Cir. 1995), *reversed on other grounds, Dillingham*, 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791. The court held that the marketplace participant exception recognized in *Boston Harbor* was not applicable to ERISA preemption cases because ERISA preemption was unusually broad, preempting any State law that "relates to" ERISA plans. *Dillingham*, 57 F.3d at 722. *Dillingham*, however, was argued in the Ninth Circuit before the Supreme Court decided *Travelers* and the Ninth Circuit did not discuss *Travelers* in its opinion. In both *Travelers* and *Dillingham*, in which the Supreme Court reversed the Ninth Circuit's *Dillingham* ruling, the Court emphasized that the phrase "relates to" should not be interpreted overly expansively, but rather that ERISA preemption should be determined in light of Congressional purposes in enacting ERISA. Therefore, the Ninth Circuit's explanation in *Dillingham*, which was overruled on other grounds,. of why *Boston Harbor* does not apply to ERISA plans is no longer good law.

There does not seem to be any reason to distinguish the application of a market participant exception in the NLRA and ERISA contexts. As with NLRA preemption, ERISA preemption was designed in part to prevent State and local interference with uniform federal regulation of a particular subject matter. Plaintiffs argue that, because the ERISA preemption provision lists certain specific exceptions, the statute implies that no other exceptions should be inferred. As discussed in the previous section, however the preemption provision applies only to "State laws." The Supreme Court has not interpreted this term in the ERISA context and the Court concludes that *Boston Harbor* provides guidance about when State actions have the effect of law. For these reasons, the Court finds it appropriate to apply *Boston Harbor* to this case.

In *Boston Harbor*, the Court held that States and local governments, when they are directly participating in the marketplace, are not free to take any action that a private party could take in that role. When either a State or a private party refuses to enter into a contract based on a "policy concern rather than a profit motive," the Court explained, that actor "would be attempting to 'regulate' the suppliers and would not be acting as typical proprietor." *Id.* 507 U.S. at 229. While private parties may take such actions, "States have a qualitatively different role to play from private parties." *Id.* When States pursue policy objectives, even in the marketplace, they play a characteristically governmental role and are more powerful than private parties, the Court observed. *Id.* Therefore, where federal law bars State regulation in a certain field, States may not pursue their policy goals in that field either through generally-applicable legislation or through proprietary actions.

Distinguishing "between government as regulator and government as proprietor," *id.* 113 S.Ct. at 1196, the Court contrasted the State agency's actions in *Gould* from the actions at issue in *Boston Harbor*. In *Gould*, the Court had concluded that the State was acting as a regulator when it refused to enter into contracts with companies that repeatedly violated the NLRA, because conditioning contracts on this requirement was an "attempt to compel conformity with the NLRA ... [and was] unrelated to the employer's performance of contractual obligations to the State." *Id.* 113 S.Ct. at 1197. In *Boston Harbor*, on the other hand, the Court concluded that the government agency acted as a "market participant" or proprietor when it attached conditions to contracts governing a specific, time-sensitive public works project that required subcontractors to sign a union contract so that there would be no labor-related work interruptions. *Id.* 113 S.Ct. at 1198. The Court concluded that the agency had "no interest in setting policy" when it imposed these conditions. *Id.* at 1197. *Cf. Associated Builders and Contractors v. City of Seward*, 966 F.2d 492, 495–96 (9th Cir. 1992) (city's requirement that contractors agree to a work preservation clause protecting the jobs of the city's own employees is not preempted by NLRA because "there is no reason to believe that the work preservation clause was motivated by labor regulatory goals"). Furthermore, pre-hire agreements such as the one imposed by the city in *Boston Harbor* were both legal and common-

place in the private construction industry. *Boston Harbor,* 507 U.S. at 230.

 Here, the City undoubtedly passed the Ordinance with policy goals in mind. The City has stated that its intent is to induce companies to stop discriminating in the provision of employee benefits. This goal, however, no matter how well-intentioned or just, conflicts with Congress' intent that ERISA permit uniform national employee benefit plan administration. Defendants argue that the City also was motivated by its proprietary interest in ensuring that its contractors, many of whom will be providing services for the City, attract a high quality workforce. This argument cannot save the Ordinance. The connection between eliminating domestic partner discrimination in employee benefit plans and the quality of services provided by the contractor is too tenuous and remote to explain the City's enactment of the Ordinance. In any case, this rationale would only exempt the Ordinance to the extent it is applied to work performed directly for the City. *See* S.F.Admin.Code § 12B.1(d)(iii). To the extent the Ordinance was applied to other conduct by City contractors, this argument could not save it under a *Boston Harbor* analysis.

Defendants claim that the Ninth Circuit's decision in *Babler Brothers, Inc. v. Roberts,* 995 F.2d 911, 916 (9th Cir.1993), indicates that the *Boston Harbor* market participant exception should apply to the Ordinance. The law at issue in that case required non-union public works contractors to pay overtime wages for all hours worked by their employees in excess of an eight-hour day, and on holidays. *Id.* at 913. Union contractors were exempted from this provision because it conflicted with the holiday schedules in these contractors' collective bargaining agreements. *Id.* Applying *Boston Harbor,* the court concluded, "the state is enforcing proscribed working conditions on public projects in which the state and local jurisdictions have a proprietary interest." *Id.* at 916. The court did not discuss the State's motivations in enacting this statute, but simply noted that the action interfered less in contractors' choices whether to sign union con-

tracts than did the law at issue in *Boston Harbor. Id.*

Although the Ninth Circuit did not expressly apply the *Boston Harbor* motivation test in *Babler,* the court noted that the State was attempting to avoid a conflict with union contracts when it exempted union contractors from the overtime provision. It is not clear whether the effect of the law favored union contractors over non-union contractors, because the union contractors' obligations under their collective bargaining agreements might have been more onerous than what the law prescribed. There was no apparent reason, therefore, for the Ninth Circuit to suspect that the State law at issue in *Babler* interfered with federal labor policy. In this case, however, the City is using its contractual relationship with City contractors to require certain benefits in their ERISA plans, something the City could not accomplish through direct regulation. *Babler* does not provide authority that the Ordinance is shielded by a market participant exception.

The two district court opinions cited by Defendants, in which the courts applied a market participant exception to ERISA preemption, do not dictate a different result. In *Minnesota,* the court concluded that a bid specification requiring contractors to sign a union contract was a proprietary action because the county's purpose was to prevent labor disruptions. *Minnesota,* 825 F.Supp. at 240–41. In contrast, Defendants have not established that the City was motivated by proprietary concerns in enacting the Ordinance. In *Lott,* the court held that a county resolution requiring contractors on all public works jobs to use union labor, which in turn required them to provide union benefits, was not preempted by ERISA. The court relied solely on the fact that the resolution was not a generally-applicable law, but only applied to the county's own public works projects. *Lott,* 1994 WL 263851 at *20. This conclusion is not consistent with *Boston Harbor.*

The Ninth Circuit has carved out one exception to the *Boston Harbor* test that is relevant to this case. In *Alameda Newspapers, Inc. v. City of Oakland,* 95 F.3d 1406 (9th Cir.1996), the court held that a city's subscription and advertising boycott of a lo-

cal newspaper based on its labor policies was not preempted by the NLRA. Although the city unquestionably was motivated by labor policy goals, the Ninth Circuit refused to infer that Congress intended to preempt boycotts, a time-honored American tradition of political expression, at least to the extent the boycotts do not have "some 'real effect' or practical economic impact on the employer that is either different from that of the ordinary consumer or is otherwise governmental in nature." *Id.* at 1416. The court repeatedly noted that Oakland's boycott amounted to no more than a "symbolic gesture" because the city had purchased only 13 subscriptions to the paper and there was no evidence that it was a significant advertiser. *Id.* at 1417. The court specifically held that the city's actions were not preempted under the authority of *Gould* or *Boston Harbor*. *Id.* at 1420.

The Court concludes, therefore, that the *Boston Harbor* market participant exception, as applied to ERISA preemption, does not shield the Ordinance except where the City wields no more power than an ordinary consumer in its contracting relationships. Because the City, however, exerts more economic power at the Airport than an ordinary consumer would, due to the City's monopoly position as the Airport proprietor, the Ordinance is largely preempted by ERISA when applied to airport contracts.

#### 5. Summary of ERISA Preemption

Plaintiffs are entitled to prevail on summary adjudication of their claim that the Ordinance is preempted by ERISA except as follows. With respect to benefits that are not covered by ERISA, such as moving expenses, memberships and membership discounts and travel benefits, and with respect to ERISA-covered benefits that are offered through non-ERISA plans, such as family medical and bereavement leave that are paid out of general assets, the Ordinance is not in any way preempted by ERISA. With respect to benefits that are covered by ERISA and provided through ERISA plans, such as family medical and bereavement leave paid from accumulated funds and health and pension benefits, the Ordinance is preempted as applied to ERISA plans if the City is exercis-

ing more economic power than an ordinary consumer could exercise. Because the City always exercises such power in its role as proprietor of the Airport, the Ordinance as applied to Airport contracts is entirely preempted insofar as it affects ERISA plans providing ERISA benefits.

### C. Preemption by the ADA

#### 1. Basis for Plaintiffs' Cause of Action

Defendants argue that Plaintiffs cannot bring a claim under the Airline Deregulation Act (ADA) because there is no private cause of action under that act. The Court concludes, however, that Plaintiffs may bring an action for injunctive and declaratory relief based directly on the Supremacy Clause.

The Second Circuit has expressly ruled that private parties such as airlines may seek declaratory and injunctive relief based on ADA preemption against the enforcement of State regulations even in the absence of a private right of action under the ADA. *Western Air Lines, Inc. v. Port Authority of N.Y. & N.J.*, 817 F.2d 222 (2d Cir.1987). Following this decision, the Ninth Circuit held that an airline had no legal basis for bringing such a claim. *Air Transport Ass'n v. Public Utilities Comm'n*, 833 F.2d 200, 207 (9th Cir.1987). In arriving at this conclusion, however, the Ninth Circuit only considered whether the plaintiff could premise the claim on a private right of action in the ADA or on section 1983 of Title 42 of the U.S. Code based on a violation of the Supremacy Clause, both of which theories the court rejected. *Id.* Although it cited *Western Air*, the court did not expressly address whether the Supremacy Clause alone could support an affirmative preemption claim. *Id.*

Since it decided *ATA*, the Ninth Circuit has stated that, as a general rule, private parties may seek injunctive and declaratory relief against enforcement of State regulations preempted by federal law, even when the federal statute itself does not create a private right of action. *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir.1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995) (discussing general rule in context of an NLRA *Garmon* preemption case). Furthermore, since *ATA* was

decided, both the Ninth Circuit and the Supreme Court have decided ADA preemption claims brought by private parties without discussing whether the plaintiffs had a legal basis for bringing the claim. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (deciding that State law was preempted by ADA in action brought by airlines and affirming district court's award of injunctive and declaratory relief); *Federal Express Corp. v. California Public Utilities Comm'n,* 936 F.2d 1075 (9th Cir.1991) (deciding ADA preemption case brought by air cargo carrier). Although *Morales* did not expressly address the basis for the airlines' claim, Plaintiffs note that the airline, in its Supreme Court briefs in that case, premised its claim on the Supremacy Clause and not on a private right of action under the ADA or on § 1983.

Finally, comments in Supreme Court decisions suggest that Plaintiffs have a valid basis for their claim. Dissenting in *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), in which the Court held that a violation of the Supremacy Clause could not support a § 1983 claim, Justice Kennedy explained, "§ 1983 does not provide the exclusive relief that the federal courts have to offer.... [P]laintiffs may vindicate *Machinists* [NLRA] pre-emption claims by seeking declaratory and equitable relief in the federal district courts through their powers under federal jurisdictional statutes." *Id.* 493 U.S. at 119. In *Shaw,* an ERISA preemption case, the Court stated, "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.* 463 U.S. at 96 n. 14. The Ninth Circuit relied on these comments in *Bud Antle. Bud Antle,* 45 F.3d at 1269.

The Court concludes, therefore, that private parties such as Plaintiffs may bring an ADA preemption claim for declaratory and injunctive relief in federal court based on the Supremacy Clause.

2. Legal Standards

The ADA provides that State and local authorities "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service" of an airline. 49 U.S.C. § 41713(b)(1). Exempted from this preemption provision, however, are State or local governments that own or operate airports when they are "carrying out [their] proprietary powers and rights" (hereinafter, the proprietary powers exception). 49 U.S.C. § 41713(b)(3).

As with all preemption provisions, the scope of ADA preemption turns on Congressional intent. The Supreme Court has stated that Congress' purpose in enacting this provision was "[t]o ensure that the States would not undo federal deregulation with regulations of their own ... [by] prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378–79, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Congress deregulated the industry to unleash market competition, the Court explained, which "would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services.'" *Id.* The Act's policy statement also reflects Congressional concern with assuring safety, developing an air transportation system that meets the public's needs, preventing unfair trade practices, and "encouraging fair wages and working conditions." 49 U.S.C. § 40101(a).

The Supreme Court has considered ADA preemption in two cases. In *Morales,* the Court focused on the meaning of the phrase "related to." *Id.* 504 U.S. at 383. Drawing on ERISA preemption law, the Court held that State laws "related to" prices, routes or services if they have a "connection with or reference to" those subjects, and the Court stated that ADA preemption has broad scope. *Id.* at 383–84. ADA preemption is not limited to laws that actually prescribe prices, routes or services, *id.* at 385, that specifically address the airline industry, *id.* at 386, or that are inconsistent with federal law. *Id.* at 386–87. Nevertheless, " '[s]ome state actions may affect [airline fares] in too

tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* at 390 (quoting *Shaw*, 463 U.S. at 100 n. 21).

Because of the Court's heavy reliance on ERISA preemption cases, *Morales* must be read in light of the Court's later admonitions that the meaning of "relate to" should not be extended to "the furthest stretch of its indeterminacy," *Travelers*, 514 U.S. at 655, and that in order to define the outer boundaries of federal preemption of State laws that "relate to" certain subjects, a court must "go beyond the unhelpful text and look instead to the objectives of the [ ] statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656. *See Gee v. Southwest Airlines*, 110 F.3d 1400, 1405–06 (9th Cir.1997) (holding that *Morales* must be interpreted in light of *Travelers* ). As this Court explained in the ERISA preemption section, *supra*, the Supreme Court in *Travelers* and *Dillingham* stated that, unless a law acts exclusively on the subjects covered by the preemption provision, courts should look to the purpose and effects of a law to determine if it has a sufficient connection with those subjects to merit preemption. Indirect economic effects that alter an air carrier's incentives but do not dictate its choices with respect to price, route or service are not sufficient to cause preemption, unless those incentives are "tantamount to a compulsion."

Even under the more lenient standards adopted in these recent ERISA preemption decisions, the Court would most likely have reached the same outcome in *Morales*. In *Morales*, the Court concluded that State laws regulating advertising of frequent flier programs were preempted by the ADA. To reach this conclusion, the Court considered a number of factors. First, the Court noted that the regulations expressly referred to airfares, that is, "prices." *Id.* 504 U.S. at

388. Second, the Court noted that, collectively, the regulations established "binding requirements as to how tickets may be marketed if they are to be sold at given prices." *Id.* Third, in some cases the regulations gave consumers a cause of action to enforce a fare. *Id.* Fourth, the Court concluded, "it is clear as an economic matter that state restrictions on fare advertising have the forbidden significant effect upon fares." [10] *Id.* at 388. Discussing this last factor, the Court explained that the rules impeded the airlines' ability to market their product effectively, thus significantly affecting consumer prices. *Id.* at 388–90. Throughout this analysis, the Court noted the ways in which the State regulation limited the airlines' ability to market restricted low-price fares on short notice and in targeted areas, thus interfering with the ADA's goal of promoting market competition between the airlines. *Morales*, 504 U.S. at 389–90. Thus, in *Morales* the Court considered whether the challenged rule explicitly referred to price, whether it imposed binding requirements on the airlines regarding price, whether it created an enforceable right to a certain price, and whether it created an enforceable right to a certain price, and whether it had a significant effect on price. These factors presumably apply as well to a court's analysis of whether a rule relates to routes or services.

In *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), the Court revisited the "related to" phrase in the ADA preemption provision. The Court concluded that State law consumer fraud and breach of contract claims based on an airline's unilateral modification of its frequent flier program related to the airline's rates, that is, "American's charges in the form of mileage credits for free tickets and upgrades," and to its services, that is, "access to flights and class-of-service upgrades." *Id.*

---

10. Plaintiffs argue that the degree to which the Ordinance affects rates is irrelevant to the preemption analysis. While acknowledging that the Court considered "the forbidden significant impact on price" as one of several relevant factors in *Morales*, they argue that the Court backed away from this factor in *Wolens*. Plaintiffs argue that *Wolens'* rejection of a lower court's "separation of matters 'essential' from matters unessential to airline operations" implies that the degree

of impact on price is irrelevant. *See Wolens*, 115 S.Ct. at 823. Plaintiffs fail to acknowledge, however, that in *Wolens* the Court restated the concern it had raised in *Morales* about whether the regulations " 'imposed [obligations that] would have a significant impact upon ... the fares [airlines] charge.' " *Id.* at 822 (quoting *Morales*, 112 S.Ct. at 2040). Thus, the degree of impact on price continues to be a relevant factor when applying the ADA preemption provision.

115 S.Ct. at 823. The Court held that a State consumer fraud act regulating deceptive trade practices, as applied to the airline's frequent flier program, was preempted by the ADA, but that a breach of contract claim was not. *Id.* at 823–24. The Court noted that the contract remedy actually promoted the ADA's goals of market competition, because "[m]arket efficiency requires effective means to enforce private agreements." *Id.*

### 3. Relates To

The Court first considers whether the Ordinance relates to a price, route or service within the meaning of the ADA preemption provision. Because Plaintiffs' "relates to services" argument addresses the fundamental purpose of the Ordinance, which is to prohibit discrimination in employment practices, the Court begins with this argument and in this context discusses whether the Ordinance conflicts with the deregulatory goals of the ADA.[11]

#### a. Relates to Service

▇▇▇ Plaintiffs claim that an argument raised by Defendants in the context of trying to establish a market participant exception under *Boston Harbor* amounts to a concession that the Ordinance relates to service and thus is preempted by the ADA. Defendants have argued that the City was motivated by proprietary concerns in enacting the Ordinance because the City believed it would bring about an improvement in service: prohibiting discrimination in benefits will induce at least some carriers to offer benefits to employees' domestic partners, which will in turn attract to the carriers highly qualified homosexual employees who otherwise would have worked elsewhere, which will in turn improve the carriers' services to the public.

The Court concludes that the Ordinance does not relate to services such that it is preempted by the ADA.

#### i) Reference To or Connection With

The Court first inquires whether the Ordinance "refers to or has a connection with" services, as those terms were interpreted in *Travelers* and *Dillingham.* The Ordinance does not refer exclusively to services; in fact, it does not refer to services at all. Nor is it essential to the Ordinance's operation that a carrier offer services to the public. Therefore, the Ordinance does not "refer to" services and it is preempted only if it has a sufficient "connection with" the carriers' services.

The Ordinance affects services in "too tenuous, remote, or peripheral a manner" to have a substantial connection with services. If any string of contingencies is sufficient to establish a connection with price, route or service, there will be no end to ADA preemption. *Cf. Californians for Safe and Competitive Dump Truck Transportation v. Mendonca,* 957 F.Supp. 1121, 1129 (N.D.Cal.1997) (rejecting argument that prevailing wage statute was preempted by ERISA because of "a rather lengthy chain of events describing how the [statute] increases wages, which increases their costs, which in turn, increases the prices" charged by plaintiffs). In *Mendonca,* the court observed that "any state regulation of the employer-employee relationship will have at least some effect on ... prices charged." *Id.* Similarly here, any change in an employer's employment practices, whether mandated by statute or not, may affect the quality of services rendered by its employees. Congress did not, however, through the ADA, exempt the airlines from generally applicable employment laws. In order for State or local regulation to relate to services, the connection must be more direct than the ultimate affect of employment policies on a carrier's services.

Plaintiffs' "connection with" argument also fails because the Ordinance, like other non-discrimination laws, does not interfere with the ADA's objective of promoting market competition among air carriers. The Ordinance does not restrict the airlines' ability to design a package of services to offer to the public, set a price for those services, market them, or deliver them. By prohibiting carriers from offering a discriminatory benefits

---

**11.** Plaintiffs argue that the Ordinance is preempted by the ADA under principles of implied preemption, either field or conflict preemption. Because application of these preemption doctrines turns on whether the Ordinance conflicts with the objectives of the ADA, a separate discussion of these doctrines would be duplicative.

package to their employees, the Ordinance somewhat limits the carriers' options and restricts their flexibility in competing for employees with other carriers or in reducing their costs and competing for customers. But every government regulation somewhat limits companies' flexibility to compete in the marketplace, and the Supreme Court has clearly stated that the ADA does not preempt all State and local regulation of airlines. Moreover, the ADA expressly provides that government attention to "fair wages and equitable working conditions" is consistent with deregulation.

Furthermore, the Ninth Circuit recently indirectly endorsed the proposition that "state laws prohibiting employment discrimination based on race, color, religion, or sex are not preempted by the ADA." *Aloha Islandair, Inc. v. Tseu,* 128 F.3d 1301, 1302 (9th Cir.1997). The court noted that the parties did not dispute this proposition and then cited *Colorado Anti–Discrimination Comm'n v. Continental Air Lines,* 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), as support. In that case, the Supreme Court held, before the ADA was enacted, that federal anti-discrimination laws did not frustrate the purpose of the Federal Aviation Act. The Second Circuit court of appeals and a state supreme court have also held that non-discrimination laws do not conflict with the deregulatory goals of the ADA and thus are not preempted. In *Abdu–Brisson v. Delta Air Lines, Inc.,* 128 F.3d 77 (2d Cir.1997), the Second Circuit concluded that nondiscrimination laws do not interfere with the objectives of the ADA. "Permitting full operation of New York's age discrimination law will not affect competition between airlines," the court held. *Id.* at 84. The court went on to consider whether the airline had proven that enforcement of the laws had actually affected its services or prices, and found that it had not. *Id.* at 84–85. Relying on *Abdu–Brisson,* the New York Court of Appeals also rejected ADA preemption in a related case. *Delta Air Lines v. New York State Div. of Human Rights,* 91 N.Y.2d 65, 666 N.Y.S.2d 1004, 689 N.E.2d 898, 900–01 (1997).

Plaintiffs cite three cases holding that such laws are preempted, but the Ninth Circuit has disapproved of at least part of the reasoning in one of the cases, the second decision has been reversed, and the reasoning in the third is unpersuasive. In *Belgard v. United Airlines,* 857 P.2d 467 (Colo.App. 1992), a Colorado appellate court reasoned that a State nondiscrimination law related to service because "the quality of the services rendered by an airline employee directly impacts upon the services that that airline renders to its customers," and the nature of the airline's services necessarily impacts two goals of the ADA: safety and promotion of market competition. *Belgard,* 857 P.2d at 470. The discrimination charge at issue in *Belgard,* however, had a direct connection with safety, a factor missing in this case. In *Belgard,* airline pilots who had undergone surgery for myopia alleged discrimination based on disability. The court concluded that "any law or regulation that restricts an airline's selection of employees, based on their physical characteristics" is necessarily related to services and is preempted by the ADA. *Id.* at 471. Nevertheless, even in the narrow area of discrimination based on disability, the Ninth Circuit has rejected the *Belgard* holding. *Aloha Islandair,* 128 F.3d at 1304 n. 4. The Ninth Circuit concluded that these laws do not implicate safety concerns because the reasonable accommodation standard takes safety into consideration and because federal requirements for flight personnel already guarantee that employees will be certified for service only if they will not pose a safety risk. *Id.* at 1302–03.

The second case cited by Plaintiffs, *Abdu–Brisson v. Delta Air Lines, Inc.,* 927 F.Supp. 109 (S.D.N.Y.1996), has been overruled by the Second Circuit, as noted above. The third case, *Marlow v. AMR Services Corp.,* 870 F.Supp. 295 (D.Haw.1994), cites *Belgard* and asserts that a whistleblower protection law limits an air carrier's ability to terminate at-will employees and thus relates to service. *Id.* at 299. The court does not discuss whether this connection with service is too remote or tenuous to justify preemption. This Court is not persuaded by *Marlow.*

Plaintiffs argue that the Ordinance interferes with a different, unstated object of the ADA: ensuring that airlines are not subject-

ed to inconsistent State and local regulation. Because no federal statute or Constitutional provision clearly prohibits a State or municipality from discriminating on the basis of sexual orientation or marital status, Plaintiffs argue, the danger of directly conflicting local regulations is particularly acute with respect to domestic partner benefits. The Court rejects this argument because Plaintiffs have not established that uniform national regulation was one of the goals of the ADA. Plaintiffs have provided no authority for this proposition and the Court cannot infer without further evidence that Congress intended to grant the air transportation industry such immunity. All national companies face the obstacle of having to comply with conflicting State and local regulation. As the Second Circuit observed in *Abdu–Brisson,*

> to the extent that the scope of the protected group in age discrimination statutes may vary from jurisdiction to jurisdiction, state and local age discrimination laws are little different from generally applicable tax, environmental, or blue sky laws, which as a general matter are not preempted under the ADA.

*Abdu–Brisson,* 128 F.3d at 84. The Court finds that the same reasoning applies to this case.[12]

The Court concludes, therefore, that the Ordinance does not relate to services because it neither refers to services nor has a connection with services sufficient to justify ADA preemption, and it does not interfere with the deregulatory goals of the ADA.

### ii) *Morales* Factors

Applying the factors considered by the Supreme Court in *Morales* confirms that the Ordinance is not preempted by the ADA. The Ordinance does not expressly refer to the airline's services to the public and it does not establish "binding requirements" as to how services should be provided or marketed. Neither does the Ordinance create enforceable rights to a particular service or quality of service by an air carrier. Nor can Plaintiffs show that the Ordinance would have the "forbidden significant effect" on the quality of the carriers' services. Although labor economists might generally agree that employment policies affect the quality of services an employee provides to the public, rarely could a direct cause and effect relationship be identified, much less measured. Under the authority of *Morales,* therefore, the Ordinance is not preempted as relating to services.

### iii) Ninth Circuit Precedent

Finally, Ninth Circuit decisions interpreting the "relates to services" standard do not dictate a different result. The Ninth Circuit has held that the ADA preempts State causes of action for negligence, intentional infliction of emotional distress and violation of a State public accommodation nondiscrimination statute based on an airline's providing drinks to a passenger who was intoxicated and who subsequently uttered racial slurs to the plaintiff, another passenger. *Harris v. American Airlines, Inc.,* 55 F.3d 1472, 1473, 1476 (9th Cir.1995). The Court held that the plaintiff's allegations "pertain[ed] directly to a 'service' the airlines render: the provision of drink. Moreover, they pertain directly to how airlines treat passengers who are loud, boisterous, and intoxicated." *Id.* at 1476. In *Gee v. Southwest Airlines,* 110 F.3d 1400 (9th Cir.1997), the court held that the ADA preempted claims for negligence and intentional infliction of emotional distress by a disabled airline passenger who said the airline failed to provide promised wheelchairs and motorized transportation at various points in her journey. *Id.* at 1403, 1406. Unlike these State causes of action, the Ordinance at issue here does not directly address the airlines' services to the public. Therefore, the Ninth Circuit's cases addressing ADA preemption based on a State law's relation to services do not alter the Court's conclusion that the ADA does not preempt the Ordinance on this basis.

---

**12.** This paragraph only addresses the burden on a carrier of modifying its personnel practices in different regions of the country to comply with State and local regulation. The possibility of a direct conflict between the Ordinance and obligations imposed in other jurisdictions—in other words, a situation in which a carrier could not comply both with the Ordinance and with State or local regulations in other areas of the country where the carrier operates—raises different concerns. The Court addresses this issue in Section V.C.3.c, *infra.*

The Court concludes, therefore, that the Ordinance does not relate to service in a manner that requires preemption by the ADA.

### b. Relates to Price

■ Plaintiffs argue that the Ordinance relates to price because it requires the airlines to extend the same free or discounted, that is, no-price or reduced-price, ticket benefits to employees' domestic partners as it extends to employees' spouses.

Defendants, relying on several passages in the House Reports that describe the goal of the ADA as providing low-cost air transportation for the general public, respond that "price" refers to airfares charged to the public. While Defendants' argument is persuasive, the Court concludes that, even if "price" refers to free or discounted tickets for employees, the Ordinance does not relate to price.

### i) Reference To or Connection With

The Ordinance does not expressly or exclusively refer to airline ticket prices. The Ordinance refers to "travel benefits" and the HRC Rules refer to "travel and relocation expenses" and "discounts." None of these terms solely refers to reduced airfares for airline employees and their family members or to general airline ticket prices. Defendants explain that the term "travel benefits" includes the privilege of bringing family members on business trips or to conventions, where the employer pays the cost of the family member's airfare. Where the employer is not an airline, this benefit does represent a change in the price charged by airlines for tickets. Travel and relocation expenses include the cost of moving employees' families from one company location to another. Discounts encompass any employer product or service that is offered to an employee at a reduced rate. It is not essential to the operation of the Ordinance, therefore, even with respect to these particular enumerated benefits, that the affected companies offer free or reduced-price airline tickets to their employees' family members. Thus, the Ordinance does not refer to airline ticket price.

Neither does the Ordinance have a sufficient connection with price to invoke ADA preemption. Again, the Court must determine whether the purpose and effect of the Ordinance interfere with the deregulatory goals of the ADA. Because the ADA was not designed to ensure uniform national administration of air carrier operations, the mere fact that the Ordinance might require some change in an air carriers' ticket benefit program is not sufficient to cause preemption. The critical inquiry in ADA preemption is whether the Ordinance interferes with market competition among air carriers. Because the Ordinance in no way requires carriers to provide free or reduced-price ticket benefits or regulates the price of those tickets, but merely requires that the benefits, if provided, must be provided in a nondiscriminatory manner, the Court concludes that the Ordinance will not interfere with market competition. While the Ordinance's nondiscrimination requirements might bring about some adjustments in these benefit programs, they do not impose requirements that prevent the carriers from offering competitive benefit packages.

Plaintiffs argue that the case for preemption is particularly strong with respect to free travel passes because this subject historically has been subject to federal regulation. They cite cases holding that carriers' ability to limit their liability with respect to employees traveling on free passes is governed by federal law. *See, e.g. Francis v. Southern Pacific Co.,* 333 U.S. 445, 449–50, 68 S.Ct. 611, 92 L.Ed. 798 (1948). These holdings do not appear to be relevant to the Ordinance, which does not address carriers' liability with respect to users of the passes. Furthermore, these cases were based on statutory construction of the Hepburn Act, which limited the classes of people to whom carriers could grant free passes. *See, id.* This act has been repealed and current Department of Transportation regulations provide that "[a]ir carriers may charge any rate or fare for interstate and overseas air transportation" on domestic flights. 14 C.F.R. § 223.11. Moreover, under the Supreme Court cases that directly govern ADA preemption, reviewed above, the Court must be guided by whether the Ordinance conflicts with the deregulatory objectives of the ADA, and the Court has concluded that it does not.

Plaintiffs cite a 1989 district court case in which the court found that federal law still preempted State regulation of limitations of liability with respect to free passes. *See Morris v. Northwest Airlines, Inc.,* 737 F.Supp. 422, 423–24 (E.D.Mich.1989). Although the court referred to the ADA preemption provision, it did so only to establish that some form of federal preemption still existed. *Id.* The court did not explain, however, why the current preemption provision would have the same scope as preemption before deregulation, and the court did not consider the regulation cited above. *Id. Morris,* therefore, is neither directly relevant to this case nor persuasive by analogy.

The Ordinance, therefore, does not refer to or have a substantial connection with price.

#### ii) *Morales* Factors

Plaintiffs have not shown that the Ordinance "relates to" price in more than a tenuous manner, when evaluated according to the *Morales* factors. First, although the Ordinance refers to "travel benefits," it does not explicitly refer to the rates charged for airline tickets. Second, unlike the law at issue in *Morales,* the Ordinance does not provide a cause of action for domestic partners to enforce a particular rate for these tickets. Only the City has a remedy for a violation of the Ordinance. Nor do the City's requirements impose "binding requirements" as to how these tickets will be priced or marketed, or even whether they will be made available to anyone. *Cf. Morales,* 504 U.S. at 388. The affected carriers may structure and price their employee travel benefits however they please and may offer or withdraw travel benefits so long as they do not discriminate against domestic partners. It naturally follows that the Ordinance will not necessarily have a significant effect on price. Although it might require some price adjustments, it does not interfere with competition among air carriers. As applied to travel benefits, as with any other term of employment, the Ordinance simply bans discrimination, and the Court has already concluded that laws banning discrimination in employment do not interfere with the objectives of the ADA.

The Court concludes, therefore, that the Ordinance is not preempted because it relates to price.

#### c. Relates to Route

■ Because the Ordinance clearly does not refer to routes, it is preempted only if it has a substantial connection with the carriers' routes. Plaintiffs argue that carriers will be forced to cease operating out of the Airport if they refuse to accept the contract terms required by the Ordinance. This would occur, of course, only if the City applies the Ordinance to leases or other contracts that are essential to a carrier's operations at the Airport. If the Ordinance has this effect, it certainly undermines the deregulatory goals of the ADA. By raising barriers to a carrier's use of a particular airport, the Ordinance would interfere with the potential for full market competition between carriers on as many routes as possible. To the extent the Ordinance has this effect, therefore, it is preempted by the ADA.

The Ordinance has this effect only if the potential cost or other burden of bringing a carrier's benefit plans into compliance with the otherwise-valid portions of the Ordinance is so great that air carriers will be coerced into changing their routes. Only if the burden of compliance is so great that carriers will reject City contracts that are essential to operating out of the Airport will the Ordinance be preempted. The parties have not briefed this issue, however, so the Court cannot decide it in this Order.

■ Plaintiffs also argue that the Ordinance relates to routes because it imposes nationwide obligations that might directly conflict with nationwide obligations imposed by a similar ordinance in another part of the country. If a carrier's contracts at two airports were conditioned on the carrier's adopting conflicting nationwide practices, the carrier would have to choose between the airports, and the carrier's routes would necessarily be affected.

Plaintiffs have not provided evidence of actual conflicts, however, and the Court finds that such conflicts are not likely to arise. Furthermore, the weight of authority seems to hold that it is inappropriate to speculate

about potential conflicts. Although one district court based its ADA preemption analysis on the potential effects of a regulation, *Abdu–Brisson*, 927 F.Supp. at 112, a New York appellate court and the Second Circuit have strongly suggested that courts should evaluate the actual effects of regulations. *Delta Air Lines*, 652 N.Y.S.2d at 257 (preemption must be determined on a case-by-case basis, citing *Colorado Anti–Discrimination Comm'n*, 372 U.S. at 719); *Abdu–Brisson*, 128 F.3d at 83–85 (citing *Delta*'s holding that preemption must be determined on a case-by-case basis, but considering both the potential and actual effects of the regulation). If conflicts arise in the future, Plaintiffs' members can seek relief at that time.

▮ Plaintiffs also claim that the Ordinance conflicts with other federal laws governing international air routes. Plaintiffs cite two federal statutes and the Warsaw Convention, see 49 U.S.C. §§ 40103, 40105; 49 Stat. 3000, but do not explain why the Ordinance conflicts with these laws. The Court sees no obvious conflict. Plaintiffs cite a district court case that holds that the Warsaw Convention preempts a State cause of action for wrongful death resulting from an air crash. *See Block v. Compagnie Nationale Air France*, 229 F.Supp. 801, 805 (N.D.Ga.1964), *aff'd* 386 F.2d 323 (5th Cir. 1967). The district court relied on provisions in this treaty that directly governed air carriers' liability toward passengers. *Id.* The *Block* decision is not relevant to this case.

#### 4. Proprietary Powers Exception

▮ The Ordinance survives ADA preemption to the extent the City is merely exercising its proprietary powers as owner of the Airport. Proprietary powers are not defined in the statute or in its implementing regulations. A Senate Report on the ADA states that the preemption provision "should not be construed to affect or limit existing proprietary rights of airport operators to manage, operate, or regulate airports." S.Rep. No. 631, 95th Cong., 2nd Sess. 39, 99 (1978). Comments in the legislative history similarly refer to "normal proprietary functions ... such as the establishing of curfews and landing fees which are consistent with

other requirements in Federal law." 123 Cong.Rec. 30, 595–96 (Sept. 23, 1977). Courts have concluded that airports are exercising their proprietary powers when they issue noise regulations, restrict access based on airport capacity, and impose perimeter rules that redirect long-haul carriers to other airports. *See Western Air Lines v. Port Authority of N.Y. & N.J.*, 658 F.Supp. 952, 956–57 (S.D.N.Y.1986) (reviewing cases), *aff'd*, 817 F.2d 222 (2d Cir.1987). The Ninth Circuit has held that the rationale for the proprietary powers exemption "extends beyond purely financial concerns ... [and applies where airport owners have] 'a rational belief that the ordinance will reduce the possibility of liability or enhance the quality of the City's human environment.'" *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 982 (9th Cir.1991) (quoting *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 n. 5 (9th Cir.1981)).

These cases do not support Defendants' claim that insisting on nondiscrimination policies is an exercise of its proprietary powers. Nor do Defendants suggest an interpretation of proprietary powers that would include application of the Ordinance but would nevertheless have some limits. Defendants cite *Boston Harbor* in support of their proprietary powers argument, but, as the Court has explained above, this case restrictively defines a municipality's proprietary role according to the City's motives. The Ordinance does not escape the limited ADA preemption identified above pursuant to *Boston Harbor*. Plaintiffs have not established, therefore, that the proprietary powers exception exempts the Ordinance from ADA preemption.

#### 5. Summary of ADA Preemption

Plaintiffs are entitled to prevail on summary adjudication of their claim that the Ordinance is preempted by the ADA when it is applied in a manner that creates coercive economic incentives for air carriers to alter their routes. With respect to all other aspects of the Ordinance, Defendants are entitled to prevail on summary adjudication of Plaintiffs' ADA preemption claim.

## D. Preemption by the RLA

Plaintiffs argue that the Ordinance is preempted by the RLA. Cases cited by both parties apply several different federal labor law preemption doctrines. The Court addresses each preemption doctrine separately. Because courts may consult NLRA cases for assistance in construing the RLA, *Ass'n of Flight Attendants, AFL–CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 544 (9th Cir.1992) (citing *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 393, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (relying on NLRA precedent to determine preemptive effect of RLA on State law)), the Court discusses NLRA cases as well as RLA cases in the discussion that follows.

■■■ First, Plaintiffs argue that the RLA preempts the Ordinance because enforcement of the Ordinance would require interpretation of the air carriers' collective bargaining agreements. Both the RLA and the NLRA preempt State causes of action to enforce collective bargaining agreements and State claims that are substantially dependent on an interpretation of collective bargaining agreements. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 2245, 129 L.Ed.2d 203 (1994) (RLA); *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (NLRA). Neither statute, however, preempts State causes of action to enforce rights that are independent of collective bargaining agreements. *Norris*, 114 S.Ct. at 2246–47 (relying on NLRA precedent). Where a State cause of action merely requires a court to consult a collective bargaining agreement, for example to determine an employee's rate of pay, federal labor law does not require preemption. *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994) (NLRA). Enforcement of the contractual nondiscrimination guarantees required by the Ordinance might require a court to consult a collective bargaining agreement to determine the benefits that a contractor provides to its employees spouses or domestic partners or both, in order to determine whether spouses and domestic partners are receiving equal benefits. The source of the right to equal benefits, however, is independent of the collective bargaining agreement. Therefore, the RLA does not preempt the Ordinance on this basis.

■■■ Second, Plaintiffs argue that the Ordinance is preempted because it imposes obligations that are inconsistent with the terms of the air carriers' collective bargaining agreements. Plaintiffs rely on a case in which a district court held that a substantive term of a collective bargaining agreement preempted a State antidiscrimination law. *See Bhd. of Locomotive Eng'rs v. Indus. Comm'n of Utah, Anti–Discrimination Division*, 604 F.Supp. 1417 (D.Utah 1985). This Court does not find this case persuasive. The court held that the collective bargaining agreement preempted State law because it had the imprimatur of federal law on it. *Id.* at 1422. The Supreme Court, however, has expressly held that the preemption doctrine discussed in the previous paragraph does not "give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation," *Allis–Chalmers*, 471 U.S. at 211–12, *quoted in*, *Norris*, 114 S.Ct. at 2248, and the district court did not cite any other relevant authority for its conclusion. Furthermore, it would be remarkable if employers and employees could agree by private contract to exempt themselves from State law. The Court, therefore, declines to follow *Locomotive Eng'rs*.

■■■ Defendants argue that the Ordinance is saved from federal labor law preemption as a minimum labor standard. States generally may not take actions that alter the balance of power between labor and management in areas deliberately left unregulated by Congress. *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm.*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), however, the Supreme Court rejected an argument that generally-applicable State laws establishing minimum labor standards for union and non-union workplaces are preempted on this basis. *Metropolitan Life*, 471 U.S. at 751–58. Employers had argued that such

laws alter the balance of power between labor and management because they require employers to adopt employment standards that employees otherwise would have had to achieve through bargaining. *Id.* at 751. The Court held, however, that such laws are part of the "backdrop" against which both sides negotiate, *id.* at 757, and observed: "Minimum labor standards affect union and non-union employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." *Id.* at 755.

The effect of the Ordinance is to bar the City from contracting with employers who discriminate, regardless of whether they are union or non-union employers. The Ordinance, therefore, neither encourages nor discourages collective bargaining. There is no reason to believe that the City enacted the Ordinance in an attempt to alter the balance of power between labor and management in the federally-governed collective bargaining process, rather than to "'give specific minimum protections to *individual* workers.'" *Metropolitan Life*, 471 U.S. at 755 (quoting *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (emphasis in original)). Therefore, the Ordinance, like the law at issue in *Metropolitan Life*, does not conflict with federal labor law.

Plaintiffs argue that *Metropolitan Life* is inapplicable because the minimum labor standards at issue in that case were enacted as a valid exercise of the State's police powers, whereas the Ordinance was not. This is not really a labor law preemption argument. If the City had no power to enact the Ordinance, the Ordinance would be invalid regardless of federal labor law preemption. Plaintiffs make this argument elsewhere and the Court addresses it in other sections of this Order. *See* Sections III.A and IV.B, *supra.* The fact that the Ordinance applies only to City contractors and is not generally applicable to all employers in the City is also irrelevant because the Ordinance applies equally to union and non-union employers. Federal labor law would preempt the Ordinance only if the Ordinance conflicted with federal labor policy. Because the Ordi-

nance's effect on federally-protected collective bargaining processes does not significantly differ from the effect of the law at issue in *Metropolitan Life*, the Court concludes that the Ordinance's nondiscrimination requirements are not preempted by the RLA.

■ Finally, Plaintiffs argue that the Ordinance is preempted because it dictates how contractors must conduct their negotiations with their unions or, alternatively, requires them to make unilateral changes in their contracts, which would violate federal labor law. Plaintiffs' specific objection, apparently, is to the HRC Rules of Procedure. These regulations temporarily suspend the Ordinance's nondiscrimination requirements for City contractors with collective bargaining agreements under certain conditions. HRC Rules of Procedure II.D(1)(c). Such contractors are not deemed to be discriminating in the provision of benefits 1) if a collective bargaining agreement governing the provision of benefits is in effect at the time of the first award of a City contract to the contractor following the effective date of the Ordinance, 2) if the contractor takes all reasonable measures to end any discrimination in benefit programs, by taking unilateral action or by asking the unions to reopen the union contract to negotiate a nondiscriminatory benefits package, and 3) if the contractor provides a cash equivalent to eligible employees in the event the contractor's reasonable efforts to eliminate the discrimination are unsuccessful. *Id.*

■ The HRC regulations seem to be designed to accommodate employers with collective bargaining agreements, granting them a reprieve from the effects of the Ordinance until they have time to negotiate with their unions before modifying their employee benefit plans. The HRC regulations do not require union contractors to ask their unions to reopen their contracts; rather, if an employer seeks to reopen a contract, the regulations temporarily waive the Ordinance's nondiscrimination requirements in order to provide time for negotiations. In order to take advantage of this waiver, the regulations also require union employers to take unilateral action in some situations, either by

modifying the benefit plans or paying cash equivalents. In most circumstances, federal labor law prohibits employers from making unilateral changes in the terms and conditions of employment, even if the changes are favorable to the employees. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (NLRA); *Hull v. Dutton,* 935 F.2d 1194, 1197 (11th Cir.1991) (RLA). Because the City cannot authorize conduct that is prohibited by federal labor law, the Court interprets the HRC regulations to condition a temporary waiver on unilateral action by a union employer only when that unilateral action is not arguably prohibited by federal labor law. *See San Diego Building Trades Council, Millmen's Union v. Garmon,* 359 U.S. 236, 244–47, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (States may not regulate conduct that is arguably protected or prohibited by NLRA); *cf. California v. Taylor,* 353 U.S. 553, 559, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957) (State law that interferes with employees' right under RLA to bargain collectively is preempted).

Defendants, therefore, are entitled to prevail on summary adjudication of Plaintiffs' claim that neither the Ordinance nor the HRC Rules of Procedure, as construed in the previous paragraph is preempted by the RLA.

## VI. Application for Rule 56(f) Continuance

Defendants applied for a continuance of these motions because they had not had a sufficient opportunity to conduct discovery regarding certain issues. Defendants claimed that they needed additional discovery related to the issue of whether the City act as a market participant or in a proprietary capacity when it applies the Ordinance to Airport contracts. Specifically, Defendants wanted to conduct discovery on the effects on the air carriers of losing particular Airport contracts. *See* Supp.Appl. and Decl. of Stewart H. Foreman in Support of Dfts' Req. for Denial or Continuance of S.J. under FRCP 56(f), filed Sept. 26, 1997, at 4, 6. Because the Court was able to decide this issue without considering the nature of individual contracts, this aspect of the Rule 56(f) application is moot. Defendants also claimed

that they needed more discovery on the issue of whether the Ordinance raises the carriers' costs to the point that it would have an effect on the price of airline tickets. *Id.* at 4–5. Because the Court did not find this issue relevant to its ADA preemption analysis, *see* Section V.C.3.b, *supra,* this aspect of the application is also moot. Consequently, Plaintiffs' motion to strike Defendants' application for a Rule 56(f) continuance also is moot. *See* Plfs' Mo. to Strike Suppl. Appl. and Decl. of Stewart H. Foreman in Support of Dfts' Req. for Denial or Continuance of S.J. under FRCP 56(f), filed October 7, 1997.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment in part, grants Defendants' motion for summary judgment in part, and denies summary judgment on the remaining issue. The Ordinance is invalid insofar as it is applied to out-of-State conduct that is not related to the purpose of the contract. S.F.Admin.Code § 12B.1(d)(iv). The Ordinance is also invalid as applied to ERISA plans providing ERISA-covered benefits where the City wields more economic power than an ordinary consumer wields, which includes all Airport contracts. Insofar as it affects non-ERISA benefits and non-ERISA plans, the Ordinance is invalid if the burden of complying with the Ordinance is so great that air carriers would be forced to stop flying out of the Airport. Because the parties have not briefed this issue, however, the Court cannot decide it in this Order.